Filed 9/26/23  P. v. Serrano CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MICHAEL RAY SERRANO et al.,<br><br>    Defendants and Appellants. | H047310, H047329<br>(Monterey County<br> Super. Ct. Nos. SS170173) |
| In re JUAN CARLOS VALENZUELA CEJA,<br><br>    on Habeas Corpus. | H049565<br>(Monterey County<br> Super. Ct. Nos. SS170173B) |

A jury convicted defendants Michael Ray Serrano and Juan Valenzuela Ceja of attempted murder and other crimes arising out of a gang-related shooting at an apartment complex in Salinas.  Both defendants were sentenced to aggregate terms of 110 years to life.

### A. Serrano's separate appellate claims (H047310)

On appeal, Serrano raises several claims of evidentiary error, specifically that the trial court erred in admitting: 1) a brief rap video with lyrics referencing shooting rival gang members; 2) expert testimony about the location of certain cell phone towers which was used to show where Serrano and his codefendants were before, during, and after the shooting; 3) expert testimony explaining how shooting a non-gang member benefits a

gang; and 4) testimony by a jail classification officer regarding where Serrano was housed in the county jail. Serrano further argues that the prosecutor committed misconduct in eliciting testimony that a weapon found in Serrano's vehicle was linked to two other uncharged shootings. Finally, Serrano claims that the foregoing errors resulted in cumulative prejudice. The Attorney General disagrees in all respects, and we agree there was no error.

With respect to his sentencing, Serrano claims he is entitled to resentencing under recently amended versions of Penal Code sections 1170 and 1385.[1,2] The Attorney General concedes that Serrano is entitled to be resentenced under the operative versions of section 1170 and section 1385, and we agree.

### B. Ceja's appellate claims and habeas petition (H047329, H049565)

Ceja argues separately that his trial counsel was constitutionally ineffective in a variety of ways. We agree with the Attorney General and find that Ceja has not demonstrated ineffective assistance of counsel in his appeal.[3]

---

[1] Unspecified statutory references are to the Penal Code.

[2] Senate Bill No. 567 (2021-2022 Reg. Sess.) (Sen.Bill. 567) amended section 1170 which now provides, in relevant part, that the low term should be the presumptive term for youthful offenders. (§ 1170, subd. (b)(6)(B); see § 1016.7 [defining "youth" as a person under age 26 when committing the crime].) Senate Bill No. 81 (2021-2022 Reg. Sess.) (Sen.Bill. 81) amended section 1385 to set forth "factors that the trial court must consider when deciding whether to strike enhancements from a defendant's sentence in the interest of justice." (*People v. Sek* (2022) 74 Cal.App.5th 657, 674 (*Sek*).)

[3] Because Ceja is not challenging the trial court's order denying his motion for a new trial, we need not and do not consider any of the materials, including several declarations filed under seal, he submitted in support of that motion. The California Supreme Court has "repeatedly stressed 'that "[if] the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation," the claim on appeal must be rejected.' [Citations.] A claim of ineffective assistance in such a case is more appropriately decided in a habeas corpus (continued)

2

In his habeas corpus petition, which this court ordered to be considered with the appeal, Ceja also claims that his trial counsel rendered constitutionally ineffective assistance. We determine that Ceja's petition, which includes materials outside the record on direct appeal, makes a prima facie showing that he is entitled to the relief requested in the petition. By separate order filed this day, we issue an order to show cause returnable in the superior court.

With respect to his sentencing, Ceja argues the court's oral pronouncement of judgment and the abstract of judgment incorrectly report his sentences as 40 years to life on count 1 and 35 years to life on counts 2 and 3. In his view those sentences are more properly described, as follows: on count 1, life with the possibility of parole, with a minimum parole eligibility date of 15 years, plus a consecutive indeterminate term of 25 years to life; and as to counts 2 and 3, life with the possibility of parole, with a minimum parole eligibility date of 15 years, plus consecutive indeterminate terms of 20 years to life. The Attorney General does not agree that Ceja's sentence on those counts was improperly described by the court or in the abstract. We conclude that the description of Ceja's sentence on these counts is accurate and does not need revision.

### C. Defendants' joint claims on appeal (H047310, H047329)

Serrano and Ceja both argue they are entitled to the retroactive application of amendments to sections 186.22 and 654, as well as newly enacted section 1109,[4] all of

---

proceeding. [Citations.]" (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267 (*Mendoza Tello*).) Our conclusions reached on direct appeal should not be interpreted as an indication of our view of the ultimate viability of the habeas corpus petition.

[4] Section 186.22 was amended to, among other things, modify the definitions of "pattern of criminal activity" and "criminal street gang," as well as clarify what is required to establish that an offense "benefit[s], promote[s], further[s], or assist[s]" a criminal street gang. (Stats. 2021, ch. 699, § 3.) Section 654 was amended to eliminate the requirement that a defendant be punished under the provision providing for the longest term of imprisonment and granting the trial court discretion to impose (continued)

3

which became effective on January 1, 2022. The Attorney General concedes that the defendants are entitled to retroactive application of the amendments to sections 186.22 and 654 but does not agree that they are entitled to the retroactive application of section 1109. As discussed below, we agree with the parties that the amendments to sections 186.22 and 654 apply retroactively. With respect to newly enacted section 1109, however, we need not reach the question of its retroactivity, because even if the statute has retroactive effect, defendants cannot show prejudice.

Serrano and Ceja note that there is a clerical error in their abstracts of judgment in that they incorrectly list the firearm enhancement imposed on counts 2 and 3 as section 12022.53, subdivision (d), instead of subdivision (c). The Attorney General agrees that the abstract of judgment should be corrected to identify that the proper firearm enhancement to counts 2 and 3 is section 12022.53, subdivision (c).

For the reasons explained below, we will reverse the judgments as to each defendant for the limited purpose of resentencing and to permit the district attorney to elect whether to retry the substantive gang offense and the gang enhancement allegations.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Procedure

Serrano and Ceja were charged in a third amended information with three counts of attempted murder (§§ 187, 664; counts 1–3), three counts of assault with a semiautomatic firearm (§ 245, subd. (b); counts 4–6), one count of shooting at an inhabited dwelling (§ 246; count 7), and one count of participation in a criminal street gang (§ 186.22, subd. (a); count 8).[5] The information also included the following

punishment under any of the applicable provisions. Newly enacted section 1109 provides that defendants may request a bifurcated trial on gang enhancements and substantive gang charges.

[5] The charges and associated enhancements in counts 1 through 8 were also alleged against codefendant Fausto Samuel Arellano. Arellano was charged individually (continued)

4

enhancement allegations: (1) the defendants committed counts 1 through 7 for the benefit of a criminal street gang (§§ 186.22, subds. (b)(1), (b)(4)); (2) the defendants personally used a firearm in committing counts 1 through 6 (§§ 12022.53, subds. (b), (c), 12022.5, subd. (a)); and (3) the defendants personally used a firearm causing great bodily injury to the victim in count 1 (§ 12022.53, subd. (d)).

The jury found Serrano and Ceja guilty on all charges and found true all of the associated enhancement allegations.

The trial court sentenced Serrano and Ceja to aggregate terms of 110-years-to-life consisting of 40-years-to-life terms on count 1 and two consecutive 35-years-to-life terms on counts 2 and 3.

As to Serrano, the trial court also imposed, but stayed pursuant to section 654, the following terms: on count 4, a total term of 26 years, consisting of the upper term of nine years, with consecutive enhancements of four years (§ 12022.5, subd. (a)), three years (§ 12022.7, subd. (a)), and 10 years (§ 186.22, subd. (b)(1)(c)); two terms of 23 years on counts 5 and 6, consisting of the upper term of nine years, with consecutive terms of four years (§ 12022.5, subd. (a)) and 10 years (§ 186.22, subd. (b)(1)(c)); a term of 15-years-to-life on count 7; and the upper term of three years on count 8.

As to Ceja, the trial court also imposed, but stayed pursuant to section 654, the following terms: on count 4, a total term of 23 years, consisting of the middle term of six years, with consecutive enhancements of four years (§ 12022.5, subd. (a)), three years (§ 12022.7, subd. (a)), and 10 years (§ 186.22, subd. (b)(1)(c)); two terms of 20 years on counts 5 and 6, consisting of the middle term of six years, with consecutive terms of four

---

with additional crimes involving drugs and firearms in counts 9 through 13. Arellano was acquitted on counts 1 through 8 but found guilty of the drug and firearm offenses in counts 9 through 13. As he is not a party to this appeal, we will only refer to Arellano where necessary to present a complete narrative of the offenses.

years (§ 12022.5, subd. (a)) and 10 years (§ 186.22, subd. (b)(1)(c)); a term of 15-years-to-life on count 7; and the upper term of three years on count 8.

The trial court imposed various fines and fees, none of which are at issue in this appeal.

Serrano and Ceja timely appealed.

**B. Facts**

Serrano and Ceja were members of La Posada Trece (LPT), a Sureño gang subset operating in Salinas. Anyone who wished to join LPT was required to commit a shooting. Arellano was an "up and coming" LPT gang member. On April 14, 2016,[6] Serrano texted Arellano that he would soon be a full-fledged member of LPT.

On April 17, Serrano and Arellano exchanged a number of text messages regarding someone shooting at Serrano's car. The following morning, Serrano texted Arellano asking if he wanted "to go look for em today.' "[7] (*Sic.*) After Arellano responded that he was "ready any time[,]' " Serrano said he was "waiting on the other toy.' "[8] Serrano and Arellano met up in person later that day.

Serrano texted another Sureño gang member named Miguel Zendejas on April 18. In those messages, Serrano told Zendejas he was taking "two individuals trying to come up in the gang to do a shooting" and asked if he could borrow a gun.

At 6:40 p.m. on April 18, Serrano called Ceja's phone, and 10 minutes later, texted Ceja the address for a Sureño gang member named Ysidro Puga. Serrano then texted Ceja to tell him he had gotten another gun. Ceja owned a white GMC Yukon

---

[6] All dates are from 2016 unless otherwise specified.

[7] The gang expert testified that Serrano was referring to the person or persons who shot at his car.

[8] The prosecution's gang expert testified that, in this context, "toy" meant a firearm.

Denali SUV with a sunroof and a distinctive bumper that was painted white rather than the standard silver.

### 1. The shooting

John Doe[9] lived in an apartment complex in Salinas in 2016. On the evening of April 18, Doe went outside his apartment to play cards with his cousin[10] and some friends in the carport. At approximately 9:00 pm, Doe and two others, including his cousin and MA3,[11] were still playing cards. MA3's cousin, MA4, came downstairs to let MA3 know he had a telephone call and stayed to watch the others play. Doe was wearing a red[12] hat, white T-shirt, and shorts.

A few minutes after MA4 came downstairs, MA3 noticed a "light silver" GMC Denali drive slowly by the carport.[13] Soon thereafter, the men heard what they initially

---

[9] Consistent with his designation at trial, we will refer to this victim as Doe in the interest of privacy. (Cal. Rules of Court, Rule 8.90(b)(4).)

[10] Doe's cousin was an active member of Santa Rita Bahamas, a Norteño gang.

[11] The trial court granted the prosecution's request to refer to MA3 and his cousin, MA4, by pseudonyms consistent with how they were identified in pretrial discovery. (Cal. Rules of Court, Rule 8.90(b)(4).)

[12] The gang expert testified that Norteño gangs associate with the color red. Doe, MA3, and MA4 denied having any gang affiliation during their trial testimony. However, when they were interviewed by the investigating detective, Derek Gibson, during his investigation into the shooting, all three men admitted to being Norteño gang members.

[13] Video from a surveillance camera at a market across the street from the carport showed a white GMC Yukon Denali slowly driving down the street "moments before the shooting." The officer who testified about the video footage noted that the vehicle was distinctive because it had a sunroof, white running boards, a white front bumper, and lacked silver metallic strips along the passenger and driver's side doors. The officer testified that, during the investigation of the shooting, he had researched this particular vehicle model online and seen them in person. He opined that "[o]n a regular Yukon that [i.e., the front bumper] is, like, silver or metal, silver metal color. And in this video (continued)

7

thought were fireworks. MA4 heard around 20 shots which he thought came from different guns. Doe was shot twice and fell to the ground as the other men ran for cover. No one else was hit by the gunfire and none of the men saw the shooters. When he realized Doe had been shot, MA3 called 911. Doe was taken to the hospital and underwent surgery. At the time of trial, Doe could not lift one of his legs as well as before and walked with a limp.

The video surveillance footage showed three people walking on the sidewalk toward the main entrance of the apartment complex. When they were on the driveway of the complex, they "opened fire" before running away.

Police collected a total of 23 bullet casings as well as bullet fragments in and around the carport. The bullets were fired from three different weapons, two of which used nine-millimeter ammunition and one which used .40 caliber ammunition.[14]

### 2. Serrano and Ceja are arrested and linked to the shooting

On April 27, Serrano was pulled over by Salinas police officers based on a report of a "suspicious vehicle." During the stop, one of the officers saw the grip of a handgun in the pocket behind the front passenger seat. Officers retrieved the weapon, a Daewoo Lionheart LH9C 9-millimeter pistol. Subsequent ballistics testing showed that the gun had been fired at the April 18 shooting. Officers also seized Serrano's cell phone from the vehicle.

Two days later, on April 29, Salinas police officers pulled over Ceja in his white GMC Yukon Denali SUV. Because Ceja's driver's license was suspended, officers removed him from his vehicle so it could be impounded. An officer began an inventory

---

it's actually white and the Yukon Denali and the colors it comes in will paint it all [*sic*] the way around the bumper."

[14] As discussed below only two of the three weapons involved—a nine-millimeter and a .40 caliber—were recovered and analyzed by ballistics experts. Some of the nine-millimeter casings at the scene were fired by a weapon that had not been located.

search of the vehicle and discovered a loaded .40 caliber Glock 23 between the driver's seat and the center console. The officer also found a loaded magazine inside the center console. Ballistics testing showed that this gun had also been fired at the April 18 shooting.

### 3. Evidence from defendants' cell phones and their service providers

Following their arrest, police obtained warrants to seize and search Serrano's, Ceja's, and Arellano's cell phones. Police also obtained records from their respective cell service providers in order to map the radio frequency signals of their cell phones.

Based on the records, Arellano's phone was located near Ysidro Puga's home two-and-a-half hours before the shooting. Approximately 90 minutes before the shooting, the phone was located near the site of the shooting. Then, between 30 to 45 minutes after the shooting, the phone was located near Arellano's house.

The records for Ceja's phone indicated that it was located near his own residence two-and-a-half hours before the shooting. Fifteen minutes later, his phone was near the crime scene and five minutes after that, it was near Puga's residence. A little more than an hour before the shooting, Ceja's phone was near Arellano's house. Immediately after the shooting, the signals from Ceja's cell phone contacted the cell phone tower closest to the location of the shooting and, a few minutes later, contacted a tower further from the crime scene along the route to his job in Morgan Hill. According to his employer's time records, Ceja clocked in to work about 9:59 p.m. on April 18.

The cell phone records for Serrano's and Arellano's phones showed that, at 9:30 p.m., they were again located near Arellano's house. Serrano's phone stopped

communicating with *any* cell towers about 90 minutes before the shooting, but started pinging off cell phone towers again 24 minutes *after* the shooting, i.e., 9:31 p.m.

In examining the calls and text messages sent and received by Ceja's and Arellano's phones over a six-week period which encompassed the date of the shooting, April 18 was the only date which those phones communicated with each other.

Police also examined Serrano's internet search history for April 18 and after. About an hour-and-a-half after the shooting, Serrano searched the internet for "Salinas, California, latest news." At 7:37 a.m. on April 19, Serrano viewed an article entitled, " 'Man shot multiple times on North Main Street in Salinas.' " He viewed two other articles describing the shooting, one on a site entitled "KION Right Now" and another from a site called "the Californian."[15] Serrano also viewed articles describing shootings that took place prior to April 18.

### 4. Gang evidence

The prosecution's gang expert, after providing brief origin stories for Norteño and Sureño gangs including their longstanding rivalry, testified that LPT is a "subset of a Sureño criminal street gang" operating in Salinas. LPT and the other Sureño gangs in Monterey County typically cooperate by committing crimes together, reporting and paying "taxes" to an overarching leadership structure, and fighting rivals—typically Norteños.

---

[15] The testimony on this subject was unclear. The officer testified Serrano, beginning at 7:37 a.m. on April 19, viewed an article entitled " 'Man shot multiple times on North Main Street in Salinas,' " which was apparently on the "KION Right Now" site, a total of 31 times. The officer then said that, at around the same time on April 19, Serrano viewed an article on "KION Right Now" which "describes a man being shot multiple times on North Main Street" a total of sixteen times. The record does not make clear whether Serrano: 1) looked at two separate and distinct articles that day; 2) viewed the same article 31 times, then an additional sixteen times after it was updated; or 3) the officer misspoke when he initially said that Serrano viewed the article 31 times. The record also does not make clear what "KION Right Now" or "the Californian" are, but from the context, we infer they are local news sources covering Monterey County.

10

At the time of the shooting, the primary criminal activities of Sureños in Salinas were "[h]omicide, attempted homicide, robberies, batteries . . . [a]nd car theft." According to the gang expert, Sureños were an ongoing organization or association and qualified as a criminal street gang.

The apartment complex where the shooting took place was associated with Norteño gang members because "multiple [Norteño] gang members [] reside in that complex[]" and "a large volume of Norteño gang activity [] takes place" there.

Among the photos recovered from Serrano's cell phone was a photograph of Arellano and Eric Nieto, a member of the Hebbron Street Sureño subset, which Serrano took on February 5. In the photo, Nieto is displaying a Sureño hand sign. Police also recovered a selfie, taken in February as well, in which Serrano is wearing a Pittsburgh Pirates[16] hat, making a hand sign commonly displayed by LPT members and Sureños.

On March 11, Arellano was pulled over while driving a Green Chevy Avalanche SUV with illegally tinted windows. Serrano was a passenger in the car and officers discovered a black gun, which turned out to be a BB gun, in the center console.

On March 12, Serrano took a photo of himself wearing a Philadelphia Phillies hat, with a blue[17] "P" and two blue stars on it, and a Los Angeles Dodgers jersey, whose apparel Sureños commonly wear because the team is located in Southern California. Serrano was displaying a Sureño hand sign in the photo.

On March 25, Serrano filmed a video of himself rapping about shooting Norteño gang members, referring to them as "busters," a derogatory term for Norteños used by Sureños. His lyrics also referenced LPT.

---

[16] LPT members commonly wear Pittsburgh Pirates apparel.

[17] The gang expert testified that Sureños associate with the color blue, whereas Norteños associate with the color red.

On April 8, Serrano took a selfie in which he is wearing a blue Phillies hat and making a hand sign associated with Sureños and with LPT.

On April 14, Serrano texted Arellano indicating that Arellano would soon be a full-fledged member of LPT. According to the text, at that time, Arellano was just an "up and coming" gang member.

A couple of months after the shooting, on June 28, Serrano was a passenger in a car that was pulled over. Officers discovered a box of 9-millimeter ammunition in the car, but no weapon.

On July 9, Serrano was the driver of a vehicle that was pulled over. Inside the car, officers found a tattoo gun as well as drawings of potential tattoos depicting Sureño gang symbols and imagery.

On October 15, Salinas police pulled Arellano over and Serrano was a passenger in the vehicle. Inside a compartment beneath a cup holder in the center console, officers found methamphetamine, cocaine, a loaded .40 caliber firearm, and ammunition in the car. Arellano admitted that it was his gun. A digital police scanner was in the back seat.

Serrano and Ceja each had a number of tattoos indicating they were members of Sureño gangs.

Following their arrest for the shooting, Arellano, Ceja, and Serrano were all housed in one of Monterey County Jail's two units for Sureño gang members. Inmates in these units who were not in good standing with the Sureños would face repercussions, which could mean anything from being "spoken to[]" to "a jail beating all the way up to a removal."[18]   While in those Sureño units, Serrano, Ceja, and Arellano had not been assaulted.

---

[18] According to the correctional officer who was testifying on this subject, a "removal [] is a violent attack meant to say, 'Hey, you're not welcome back into this pod. You're no longer a Sureño ….  You have to leave.' "

Based on the above information, and the facts of the shooting, the gang expert opined that Arellano, Ceja, and Serrano were active participants in the Sureño street gang in April 2016. In his opinion, a hypothetical shooting matching the facts of the crime would be committed for the benefit of, at the direction of, and in association with a criminal street gang and would promote or assist criminal conduct by Sureños.

### 5. Ceja's defense[19]

Ceja went to work on the night of the shooting at his employer's plant, located in Morgan Hill. The HR manager testified as to how employees clock in and out of work by using a fingerprint scanner at the job site.

A supervisor at the company identified Ceja at trial as someone he worked with, but he knew him as "Carlos Delgado." The supervisor authenticated a timesheet for "Carlos Delgado" showing that he signed in for work at 9:59 p.m. on April 18.[20] On cross-examination, the supervisor testified that employees would clock in by calling a telephone number and inputting their employee ID. It was only recently that employees would be able to clock in with a fingerprint scan.

### 6. Rebuttal evidence

The district attorney's investigator testified that on two occasions he drove from the last area in Salinas that Ceja's phone pinged a cell tower (which occurred at 9:19 p.m. on April 18) to Ceja's work site in Morgan Hill. The investigator left at 9:19 p.m. on both trips and varied his speed, driving at or just above the speed limit. The first trip took 37 minutes and 48 seconds and the second took 33 minutes and 56 seconds.

---

[19] Arellano also presented a defense, but Serrano did not. In final argument, Serrano's counsel focused on the lack of direct evidence demonstrating that Serrano was present at the scene of the shooting, arguing that the prosecution had thus failed to meet its burden of proof.

[20] Salinas police were dispatched to the apartment complex shooting at 9:08 p.m. on April 18.

13

## II.   DISCUSSION

### A. Serrano's appeal

#### 1. Admission of Serrano's rap video and lyrics

Serrano argues that the trial court erred in allowing the prosecution to admit a video from his cell phone in which he "raps" about gang life in LPT. He contends the admission of this evidence: 1) violated his First Amendment right of free expression; 2) was unduly prejudicial in violation of Evidence Code section 352; and 3) violated his right to due process. The Attorney General counters that introducing the video did not inhibit Serrano's free expression rights, the video was highly probative of his motive and intent, and it was not unduly prejudicial. As we explain below, we agree with the Attorney General on these points.

Serrano submitted an additional supplemental brief addressing recently enacted Evidence Code section 352.2[21] and citing to *People v. Venable* (2023) 88 Cal.App.5th

---

[21] Evidence Code section 352.2 provides: "(a) In any criminal proceeding where a party seeks to admit as evidence a form of creative expression, the court, while balancing the probative value of that evidence against the substantial danger of undue prejudice under [Evid. Code] Section 352, shall consider, in addition to the factors listed in [Evid. Code] Section 352, that: (1) the probative value of such expression for its literal truth or as a truthful narrative is minimal unless that expression is created near in time to the charged crime or crimes, bears a sufficient level of similarity to the charged crime or crimes, or includes factual detail not otherwise publicly available; and (2) undue prejudice includes, but is not limited to, the possibility that the trier of fact will, in violation of [Evid. Code] Section 1101, treat the expression as evidence of the defendant's propensity for violence or general criminal disposition as well as the possibility that the evidence will explicitly or implicitly inject racial bias into the proceedings. [¶] (b) If proffered and relevant to the issues in the case, the court shall consider the following as well as any additional relevant evidence offered by either party: [¶] (1) Credible testimony on the genre of creative expression as to the social or cultural context, rules, conventions, and artistic techniques of the expression. [¶] (2) Experimental or social science research demonstrating that the introduction of a particular type of expression explicitly or implicitly introduces racial bias into the proceedings. [¶] (3) Evidence to rebut such research or testimony. [¶] (c) For purposes of this section, 'creative expression' means the expression or application of creativity or imagination in (continued)

445, review granted May 17, 2023, S279081 (*Venable*).  *Venable* held that Evidence Code section 352.2, which adds factors trial judges must consider before admitting forms of creative expression (e.g., rap lyrics and videos) as evidence, has retroactive application.

We respectfully disagree with the reasoning in *Venable* and conclude that the statute is not retroactive.  However, even if it were, we decide the other evidence implicating Serrano in the shooting was such that no reasonable jury would have acquitted him had the rap video and lyrics been excluded.

### a. Additional background

The prosecution brought an in limine motion seeking to introduce a video from Serrano's phone that he created three weeks prior to the April 18 shooting.  The prosecution argued the video was probative of Serrano's state of mind and intent, as well as his association with LPT.

Serrano objected, arguing that the video was not relevant because: 1) the amount of time that elapsed between its creation and the shooting reduced its probative value; 2) in gangster rap culture, the lyrics[22] and themes are commonplace and thus had no nexus to the shooting; and 3) Serrano did not disseminate the video.  Serrano also argued the video was unduly prejudicial and inflammatory.

---

the production or arrangement of forms, sounds, words, movements, or symbols, including, but not limited to, music, dance, performance art, visual art, poetry, literature, film, and other such objects or media. [¶] (d) The question of the admissibility of a form of creative expression shall be heard in limine and determined by the court, outside the presence and hearing of the jury, pursuant to [Evid. Code] Section 402. The court shall state on the record its ruling and its reasons therefor."

[22] The lyrics were as follows: " 'Creepin', in the middle of the night. Lookin' for a busta to take away his life. Why . . . would you wanna fuck wid me? My automatic will spray 16. We're tossin' it up. Not givin' a fuck. We're lightin' 'em up, bustin' round after round. Holdin' our ground, Salastown. That's where we be found posted up in the fuckin' cuts. You know where the fuck I be? 831, Salastown. LPT and I'm out bitch . . . bitch.' "

15

The court admitted the video, stating that it "is highly probative" and not unduly prejudicial. The court continued that the lyrics were evidence of Serrano's "allegiance to a certain [Sureño] gang," a "rivalry between that subset [i.e., LPT] and another gang" in Salinas, his willingness to "use [] a firearm," and his "motive[.]"

The rap video was played for the jury. In both her opening and final arguments, the prosecutor referenced the video and its lyrics several times, particularly the line " 'Looking for a busta to take away his life' " which she characterized as an "ongoing theme" for the trial, demonstrating Serrano's motive and intent.

### b. Applicable legal principles

We review the trial court's evidentiary rulings for an abuse of discretion. (*People v. Waidla* (2000) 22 Cal.4th 690, 717 (*Waidla*).) A court has broad discretion under Evidence Code section 352 to exclude relevant evidence if it determines the probative value is substantially outweighed by its possible prejudicial effects. (*People v. Merriman* (2014) 60 Cal.4th 1, 74 (*Merriman*), citing *People v. Clark* (2011) 52 Cal.4th 856, 893.)

"We will not reverse a court's ruling on such matters unless it is shown ' "the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*Merriman*, *supra*, 60 Cal.4th at p. 74, quoting *People v. Brown* (2003) 31 Cal.4th 518, 534.) Generally, the application of ordinary rules of evidence does not implicate the federal Constitution; accordingly, we review allegations of error under the "reasonable probabilit[y]" standard of *People v. Watson* (1956) 46 Cal.2d 818, 837 (*Watson*), unless the erroneous admission of evidence affects the fundamental fairness of the trial, in which case we apply the de novo standard of review. (*People v. Marks* (2003) 31 Cal.4th 197, 227; *People v. Albarran* (2007) 149 Cal.App.4th 214, 224, fn. 7.)

***c. Admission of the evidence did not infringe Serrano's First Amendment rights***

It is axiomatic that Serrano's freedom of expression is protected under both the First Amendment to the United States Constitution as well as Article I, section 2 of the California Constitution.[23]  Although these constitutional provisions limit the government's ability to regulate the content of speech, they do "not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent."  (*Wisconsin v. Mitchell* (1993) 508 U.S. 476, 489 [113 S.Ct. 2194, 124 L.Ed.2d 436].)  If the evidence is relevant to the issues being tried, its use does not violate the First Amendment.  (*People v. Quartermain* (1997) 16 Cal.4th 600, 629; *People v. Smith* (2003) 30 Cal.4th 581, 626 [admission of evidence that is "relevant to actual criminal conduct . . . does not violate [a defendant's] constitutional free speech rights"].)

Serrano's First Amendment challenge is premised on his claim that "[t]he threat of admitting fictional, artistic writings into evidence to prove generalized notions of intent in criminal trials will have an impermissible chilling effect."  This analysis overlooks the fact that Serrano's rap video and lyrics were not admitted simply to prove his generalized intent; rather, they were admitted to show that he considered himself a member of LPT and, as part of that affiliation, participated in a nighttime shooting of rival Norteño gang members.

In Serrano's view, the probative value of the video and lyrics was minimal, because rap lyrics commonly refer to shooting rival gang members, and the details of his lyrics did not closely track the circumstances of the shooting.[24]  In this case, we are not

_____

[23] Serrano does not argue the free speech protections of Article I, section 2 of the California Constitution are, at least in this context, meaningfully different from the protections afforded by the First Amendment of the U.S. Constitution.  We will likewise treat those protections as congruent.

[24] For example, the rap lyrics referred to "the middle of the night[,]" but the shooting occurred at 9:00 p.m.   Serrano said in his rap that his weapon was an "automatic", which could fire 16 rounds, but the gun found in Serrano's car was a semi-automatic with a 10-round magazine.

persuaded that the differences significantly reduce the probative value of the evidence. While the lyrics might have *more* probative value had they precisely mirrored the shooting, there were enough similarities to warrant its consideration by the jury. Serrano's lyrics indicated his allegiance to LPT, a Sureño subset, and spoke of "[l]ookin' for a busta [i.e., a Norteño gang member] to take away his life." The shooters here walked up on the victims, in an apartment complex associated with Norteños, and opened fire without warning which could be considered "creepin[g]."[25] While the shooting may have taken place earlier in the evening, and not the middle of the night, it was dark outside. As for the weapon's firing mechanism and magazine size, the differences between an automatic weapon with a 16-round magazine and a semi-automatic weapon with a 10-round magazine are a matter of degree not kind. Even with semiautomatic weapons, the shooters were able to fire 23 shots at the victims, who initially thought they were hearing firecrackers, in a matter of seconds.

Further, *State v. Skinner* (2014) 218 N.J. 496 (*Skinner*), on which Serrano relies, is distinguishable and thus has little persuasive value here. In *Skinner*, the New Jersey Supreme Court examined whether evidence of rap lyrics seized from the defendant's vehicle could be admitted to show motive and intent under the applicable state rule of evidence (N.J.R. Evid. 404, subd. (b)) regarding " '[o]ther crimes, wrongs or acts' ". (*Skinner*, *supra*, 218 N.J. at pp. 512.) The evidence in question was contained in three notebooks and, although there was no evidence offered as to when the defendant composed the various lyrics which were recited to the jury, the prosecution conceded that "many of the lyrics … were composed long before the circumstances underlying the instant offense took place." (*Id*. at p. 503.) At trial, a prosecution witness "read extensively from defendant's lyrics[,] … [t]he trial transcript of that uninterrupted

_____

[25] Merriam-Webster's defines "creeping" to mean "developing or advancing by slow imperceptible degrees." (Merriam-Webster's Dict. Online  https://www.merriam-webster.com/dictionary/creeping [as of March 7, 2023].)

reading stretches thirteen pages. The material was replete with expletives and included graphic depictions of violence, bloodshed, death, maiming, and dismemberment." (*Id.* at p. 504.)

Unlike *Skinner*, Serrano's lyrics were brief and not particularly graphic in nature. In *Skinner*, the court also emphasized there was no evidence that the defendant had engaged in any of the events described in his rap lyrics and observed that the prosecution had presented no evidence undermining the conclusion that "[t]he lyrics can only be regarded as fictional accounts." (*Id.* at p. 251.) Here, Serrano rapped about "[h]oldin' our ground, Salastown"[26] and "LPT" thus reflecting his focus on protecting Sureño territory by attacking and killing Norteños.

### d. The trial court did not abuse its discretion in admitting the evidence under Evidence Code section 352

In addition to his First Amendment challenge, Serrano alternatively argues that the trial court erred in its analysis of the evidence under Evidence Code section 352. In his view, the highly prejudicial impact of his rap lyrics "far outweighed any probative value" that the evidence had.

There is no blanket prohibition in California law against admitting rap lyrics into evidence and several cases involving gang offenses have concluded that the probative value of such evidence can outweigh its unfair prejudice. In *People v. Olguin* (1994) 31 Cal.App.4th 1355 (*Olguin*), the court affirmed the trial court's admission of rap lyrics, indicating that the lyrics demonstrated the defendant's gang membership, "his familiarity with gang culture, and, inferentially, his motive and intent on the day of the killing." (*Id.* at p. 1373.) Although the lyrics also "might be interpreted as reflective of a generally

---

[26] Detective Gibson, the investigating officer, testified that the line, " '831, Salastown' " referred to the 831 area code prefix for Monterey County and that "Salastown" referred to Salinas.

violent attitude[,]" that prejudicial impact "could not be said [to] 'substantially' [] outweigh their considerable probative value." (*Ibid.*)

Similarly in *People v. Zepeda* (2008) 167 Cal.App.4th 25 (*Zepeda*), the prosecutor introduced evidence of defendant, a Norteño gang member, singing rap lyrics describing committing violent acts against Sureños. (*Id.* at pp. 33-34.) In rejecting defendant's Evidence Code section 352 argument on appeal, the court concluded the "evidence was probative of defendant's state of mind and criminal intent, as well as his membership in a criminal gang and his loyalty to it." (*Id.* at p. 35.) That evidence, in conjunction "with the other evidence of defendant's gang membership and his animosity towards Sureños," took the lyrics outside the realm of "mere fiction" and revealed the defendant's "state of mind, his motives and intentions, and his fealty to furthering his criminal gang's activities." (*Ibid.*)

In this case, Serrano was charged with multiple offenses, all of which were alleged to have been committed for the benefit of a criminal street gang. As a result, evidence of Serrano's membership in a gang was highly relevant to the case. Serrano's gang affiliation went to the prosecution's theory of his motive for the shooting, and "[a] trial court has wide latitude to admit evidence relevant to motive." (*People v. Johnson* (2019) 32 Cal.App.5th 26, 62.) Where, as here, a crime is alleged to be gang related, "evidence tending to show" gang membership is "highly relevant." (*Olguin, supra*, 31 Cal.App.4th at p. 1373.)

Beyond the question of gang membership, however, the rap video and lyrics were also probative of Serrano's motive, i.e., using a gun to kill Norteños. The prosecution's gang expert testified that gang members use music, and rapping in particular, to "communicate with each other[,]" "promote their own criminal conduct[,]" and "show their loyalty to their gang[.]" The gang expert also confirmed that the rap video was one of the pieces of evidence he relied upon in forming the opinion that Serrano was an active member of LPT on the day of the shooting.

20

It is also significant that the video was made just 24 days before the shooting and the details closely resembled that of the shooting itself. The lyrics described coming upon Norteños in Salinas at night and, without warning, firing multiple rounds at them in an attempt to kill them. As a result, these lyrics were highly probative of Serrano's motive and his intent that night.

On the other side of the ledger, the lyrics themselves were not particularly graphic, nor were they lengthy which might have made the evidence more prejudicial. The video was brief, did not show Serrano's face at all, just his torso and one of his hands keeping the rhythm of the song.

On these facts, we conclude that the trial court did not abuse its discretion in admitting the rap video and lyrics. (*Olguin*, *supra*, 31 Cal.App.4th at pp. 1372-1372; *Zepeda*, *supra*, 167 Cal.App.4th at p. 35.)

### e. Even assuming error, admission of the evidence was not prejudicial

To show reversible error under state law, Serrano must show a reasonable probability of obtaining a more favorable result at trial if the evidence had been excluded. (*Watson, supra,* 46 Cal.2d at p. 836.) Serrano also asserts that we should examine prejudice under the stricter federal standard set forth in *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*) in which the burden would be on the Attorney General to show the error was harmless beyond a reasonable doubt. Because we have already determined that there was no violation of the First Amendment in admitting the video and lyrics and Serrano has not shown that introduction of the evidence rendered his trial fundamentally unfair, we will apply the standard set forth in *Watson* although we conclude there was no prejudice under either approach.

21

In this case, the jury was instructed with CALCRIM No. 303[27] not to consider any of the gang activity evidence, including the rap video and lyrics, as evidence of Serrano's bad character or his propensity to commit crimes. The prosecutor emphasized this part of the instruction in rebuttal argument, stating "we're not here to prosecute individuals for making gangster rap. Yes, it's offensive. But on its own it really isn't anything." According to the prosecutor, the rap video's value as evidence was tied to the other evidence showing Serrano's motivation for shooting at Norteños, specifically his membership in, and loyalty to, LPT.

Ultimately, Serrano cannot show prejudice under either *Watson* or *Chapman* due to the ample evidence aside from the rap video establishing his guilt. When Serrano was arrested, one of the guns used in the shooting was found in his vehicle. Serrano's text messages on April 17 discussed organizing a shooting, both as retaliation and as a means of increasing an "up and coming" member's gang status. His texts on April 18 were about his efforts to obtain another weapon, after which the shooting could proceed.

On the night of April 18, around 7:00 p.m., Serrano's cell phone was located near another Sureño member's home, as were Ceja's and Arellano's phones. Serrano's phone stopped communicating with any cell towers about 90 minutes before the shooting and began pinging off cell phone towers 24 minutes *after* the shooting, i.e., 9:31 p.m. At that time, both Serrano's and Arellano's phones were located near Arellano's house. Less

---

[27] CALCRIM No. 303 provides in relevant part, as follows: "You also may consider the evidence presented of gang activity only for the limited purpose of deciding whether: [¶] A defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related crimes and enhancements or allegations charged; [¶] OR, [¶] A defendant had a motive to commit the crimes charged. [¶] You may also consider this evidence when you evaluate the credibility or believability of a witness and when you consider the facts and information relied on by an expert witness in reaching his or her opinion. [¶] You may not consider this evidence for any other purpose. You may not conclude from this evidence that a defendant is a person of bad character or that he has a disposition to commit crime."

22

than an hour later, Serrano began searching for news about the shooting and, over the next two days, viewed two news articles about the shooting multiple times.

In addition, the prosecution's gang expert opined that Serrano was a member of LPT, corroborated by photographs of him displaying LPT gang signs and showing his gang-related tattoos. A jail classification officer testified, based on his personal knowledge, that Serrano was housed in one of the two Sureño pods following his arrest in this case.

In light of the overwhelming evidence of guilt, any error in the admission of the rap video was not prejudicial applying either state or federal constitutional standards of prejudice. (*Watson*, *supra*, 46 Cal.2d at p. 836; *Chapman*, *supra*, 386 U.S. at p. 24.)

### *f. Evidence Code section 352.2 is not retroactive*

In supplemental briefing, Serrano argues that newly enacted Evidence Code section 352.2 retroactively applies and the matter must be remanded to the trial court for it to consider the admissibility of the rap video and lyrics pursuant to that statute. He cites *Venable, supra*, 88 Cal.App.5th 445, in support of this argument. We disagree with *Venable* and conclude that Evidence Code section 352.2 is not retroactive.

Effective January 1, 2023, Assembly Bill No. 2799 (2021-2022 Reg. Sess.) added section 352.2 to the Evidence Code. (Stats. 2022, ch. 973, § 2.) The newly enacted statute provides additional procedures and factors to consider in a criminal proceeding before admitting evidence of creative expression under Evidence Code section 352, and its purpose is to guard against introducing stereotypes or activating bias and to exclude character or propensity evidence against the defendant. (Stats. 2022, ch. 972, § 1, subd. (b).)

In *Venable*, the court concluded that Evidence Code section 352.2 has ameliorative effect and thus applies to cases not yet final on appeal. (*Venable*, *supra*, 88 Cal.App.5th at p. 456.) In that case, which involved a gang-related murder, the prosecution introduced into evidence a rap video, found on YouTube, featuring the

23

defendants' younger brother, the defendant, and other gang members, flashing gang signs and displaying guns, drugs, and money. (*Id*. at p. 452.) The lyrics included a line that the prosecution's gang expert testified meant that the defendant's younger brother had heard that a gang member shot someone in the head on the street where the charged murder occurred. (*Id*. at pp. 452-453.)

In finding that Evidence Code section 352.2 has retroactive application, *Venable* relied heavily on *People v. Frahs* (2020) 9 Cal.5th 618 (*Frahs*), in which the California Supreme Court explained that ' "[t]he *Estrada* rule rests on an inference that, in the absence of contrary indications, a legislative body ordinarily intends for ameliorative changes to the criminal law to extend as broadly as possible, distinguishing only as necessary between sentences that are final and sentences that are not." ' (*Frahs, supra*, 9 Cal.5th at p. 628.)" (*Venable*, *supra*, 88 Cal.App.5th at p. 456.) Although the statute at issue in *Frahs*, which gave trial courts discretion to grant pretrial diversion in certain cases "was procedural and … didn't directly reduce punishment … the [California] Supreme Court dug deeper." (*Venable*, *supra*. At p. 456.) The *Venable* court was persuaded that the appropriate consideration is whether the amendment " 'by design and function' " provides the potential for an ameliorative effect even where the "legislative changes … did not directly or necessarily affect punishment." (*Id*. at pp. 456-457, quoting *Frahs*, *supra*, at p. 624.)[28]

*Venable* was further persuaded by this court's majority opinion in *People v. Burgos* (2022) 77 Cal.App.5th 550, review granted July 13, 2022, S274743 (*Burgos*), which found newly enacted section 1109, which permitted defendants to request a

---

[28] The *Venable* court also cited *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299 (*Lara*) in which the California Supreme Court concluded that Proposition 57, which changed certain juvenile court procedures, had retroactive application. (*Venable*, *supra*, 88 Cal.App.5th at p. 457.) Again, it was the Supreme Court's emphasis on how the "effect of the change was to increase the likelihood of a lesser sentence for a class of defendants" that was important to the analysis in *Venable*. (*Ibid*.)

bifurcated trial of gang charges and enhancements, to have retroactive effect. (*Venable*, *supra*, 88 Cal.App.5th at p. 457.) The important point, according to *Venable*, was that "bifurcation increases the possibility of acquittal, 'which necessarily reduces possible punishment.' (*Burgos*, at p. 567, review granted.) " (*Venable*, *supra*, 88 Cal.App.5th at pp. 457-458.)

Respectfully, we do not agree with the conclusion reached in *Venable* that Evidence Code section 352.2 is retroactive. The Legislature, acting within its authority, has determined that additional safeguards are necessary before "creative expression" (which clearly includes rap lyrics and videos of such lyrics being performed) can be introduced by "a party." (Evid. Code, § 352.2, subd. (a).) Although the new statute requires trial courts to exercise heightened caution in deciding whether to admit such evidence, in enacting Evidence Code section 352.2, the Legislature has not prohibited rap lyrics or other forms of creative expression from being utilized in a criminal proceeding.

"Generally, statutes are presumed to apply only prospectively. [Citation.]" (*Frahs*, *supra*, 9 Cal.5th at p. 627.) In *Estrada*, the California Supreme Court held "that amendatory statutes that lessen the punishment for criminal conduct are ordinarily intended to apply retroactively." (*Frahs*, *supra*.) In assessing whether Evidence Code section 352.2 is retroactive, we believe the statute is considerably different from the changes in law made in the cases relied upon by *Venable*. For example, we are not dealing here with an amendatory act that "ameliorated the possible punishment for a *class of persons*." (*Lara, supra*, 4 Cal.5th at p. 308 [i.e., juveniles] (italics added); see also *Frahs*, *supra*, 9 Cal.5th at p. 631 [i.e., defendants who suffer from a qualifying mental disorder].) Evidence Code section 352.2 applies to *any* criminal proceeding in which "*a party*" seeks to introduce evidence of creative expression. (*Id*. at subd. (a), italics added.) We conclude that any link between Evidence Code section 352.2's additional lens for evaluating evidence of creative expression and a lessening of punishment for criminal conduct is too attenuated to warrant retroactive application. Although the Legislature, in

25

enacting Evidence Code section 352.2, may have been concerned about bias against people of color and people who express themselves through rap, the statute is not so narrow in scope. While it will likely be utilized most frequently in gang cases, the statute itself does not contain any such limitation, nor is it limited to any particular form of creative expression, e.g., rap. Even more importantly, in our view, the statute may be used by any party to a criminal proceeding, not just a defendant. For example, the prosecution could invoke Evidence Code section 352.2 in a case where a defendant offers the creative expression of a codefendant or a third party in an attempt to implicate that other person for the crime(s) at issue. Assuming the prosecution succeeded in excluding creative expression evidence offered by a defendant in such a case, the impact of the statute would be the opposite of ameliorative.

Our research has disclosed no case, aside from *Venable*, which has held that an amendment to the Evidence Code has retroactive application.[29] In *Frahs*, the statutory changes at issue were to the Penal Code. (*Frahs*, *supra*, 9 Cal. 5th at pp. 626-627.) In *Lara*, the changes were to the Penal Code and the Welfare and Institutions Code by way of Proposition 57. (*Lara*, *supra*, 4 Cal.5th at p. 303.) In criminal cases, the prosecution, the defense, and the trial courts apply the existing rules of evidence to determine what evidence is and is not admissible. We conclude that the changes imposed by Evidence Code section 352.2 do not apply retroactively.

Even if Evidence Code section 352.2 were retroactive, Serrano cannot show that he was prejudiced by the failure to apply it at his trial in light of the considerable evidence of his guilt as we discussed in detail above.

---

[29] We do not foreclose the possibility that a future change to the Evidence Code could be deemed ameliorative and within the spirit of *Estrada*. More recently, the Fourth District Court of Appeal, Division One, and the Third District Court of Appeal disagreed with *Venable* and held that Evidence Code section 352.2 is not retroactive. (*People v. Ramos* (2023) 90 Cal.App.5th 578, 596 (*Ramos*); *People v. Slaton* (Sept. 11, 2023, C096437) __ Cal.App.5th ___ [2023 Cal. App. LEXIS 696] (*Slaton*).) We agree with the reasoning in *Ramos* and *Slaton*.

26

### 2. Prosecutorial misconduct

Serrano's next claim of error is that the prosecutor committed misconduct by eliciting testimony from an investigating officer that the weapon found in Serrano's vehicle was linked to two other shootings. We conclude there was no misconduct, but even if there were, Serrano cannot show prejudice.

### a. Additional background

Detective Gibson was assigned to investigate the April 18 shooting. During the prosecution case, the prosecutor asked Gibson about a ballistics memorandum he had received relating to this case. Before Gibson began to describe the memorandum, the prosecutor asked for a bench conference[30] and advised the court he wanted to caution Gibson to limit his testimony about that memo to the facts of this case. Although defense counsel asked for a recess so that the prosecutor could have a discussion with Gibson without the jurors in the room, the trial court had the prosecutor turn off his microphone and speak to Gibson quietly in the courtroom.

When Gibson resumed his testimony, he said he received information that the firearm recovered in Serrano's vehicle had a high probability of being linked to "this case as well as two others." Defense counsel objected and the trial court confirmed that the testimony was for "this case only." The court immediately instructed the jury that "[a]nything related to anything else is stricken. The jury is to disregard that."

During a break in the proceedings, the trial court chastised both the prosecutor and the witness for his reference to other shootings, cautioning them both that "if it happens again you run the risk of a mistrial and you definitely run the risk of sanctions. … [¶] By that when I say 'again' I mean not just this case."

---

[30] Outside the presence of the jury, the court subsequently summarized the bench discussion on the record.

### b. Applicable legal standards

A prosecutor engages in prosecutorial misconduct under state law if he or she uses deceptive or reprehensible methods to attempt to persuade either the trial court or the jury. (*People v. Morales* (2001) 25 Cal.4th 34, 44.) Under both California law and the federal Constitution, a prosecutor may commit misconduct warranting reversal of a judgment by intentionally eliciting inadmissible testimony. (*People v. Fuiava* (2012) 53 Cal.4th 622, 679; *People v. Smithey* (1999) 20 Cal.4th 936, 959-960.) " 'Improper comments violate the federal Constitution when they constitute a pattern of conduct so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.' " (*People v. Bell* (2019) 7 Cal.5th 70, 111.) "A defendant's conviction will not be reversed for prosecutorial misconduct, however, unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct." (*People v. Crew* (2003) 31 Cal.4th 822, 839.)

### c. Analysis

In this case, the record of what occurred is relatively clear. The prosecutor, with the knowledge that the ballistics memo referred to additional uncharged shootings, admonished Gibson to restrict his testimony about the report to the facts of this case. However, on the stand, Gibson testified that the memo indicated there was a high probability the weapon found in Serrano's vehicle was linked to this shooting and two others. Serrano's counsel immediately objected and the court both struck the testimony relating to "anything else" other than the April 18 shooting and admonished the jury to disregard the stricken testimony.

On this record, it cannot be said with any certainty that the prosecutor intentionally sought to elicit inadmissible testimony. Gibson's testimony, which may or may not have been inadvertent, was both brief and immediately stricken by the court. The court then admonished the jury to disregard any testimony related to anything aside from the April 18 shooting.

28

We disagree with Serrano that any prejudice from Gibson's testimony could not be cured by the court's admonition. The bulk of Gibson's testimony was focused on the evidence seized from Serrano's cell phone, specifically the texts, photographs, rap video, and browser history. The expert testimony matching the weapon found in Serrano's vehicle with the April 18 shooting was proffered by a different witness. "Witnesses sometimes blurt things out or, as here, testify in unanticipated ways. We have to trust the trial court to take corrective measures when necessary, as the court here did, and the jury to follow the court's instructions." (*People v. Melendez* (2016) 2 Cal.5th 1, 33.)

It was not reasonably probable that the brief reference to other shootings affected the outcome of the proceedings as required under state law to establish prejudice. (*Watson*, *supra*, 46 Cal.2d at p. 836.) Furthermore, there is no showing that the reference to other shootings, which was never repeated, infected the trial with unfairness sufficient to violate due process under the federal standard for prosecutorial misconduct. (*People v. Morales* (2001) 25 Cal.4th 34, 44.)

Accordingly, we conclude there was no prosecutorial error, but even assuming there was, it was not prejudicial.

### 3. Cell phone expert witness testimony was admissible

Serrano contends the testimony of the prosecutor's cell phone expert witness regarding the location of cell phone towers in Monterey County was inadmissible case-specific hearsay. We disagree. The expert's testimony was neither hearsay nor case specific.

### a. Additional background

Before trial, Arellano, joined by Serrano and Ceja, filed a motion in limine objecting to the prosecutor's cell phone expert's qualifications "such that he is going to offer an opinion about Radio Frequency Coverage Areas related to cell phone towers," and to "any testimony about specific coverage areas to specific towers" as case-specific hearsay as set forth in *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*). The trial court

ruled that the expert could be called by the prosecution subject to defense voir dire on his qualifications and, with respect to the locations of cell towers and coverage areas, the witness "would have to establish a non-hearsay basis for that type of specific information."

At trial, the expert, Peter Austen, testified that, in addition to his experience evaluating cell phone evidence as a police officer, he had an additional 100 hours or so of formal training in cell phone analysis, including radio frequency (RF) coverage. During voir dire, Austen testified that he downloads the location of relevant cell phone towers through a website maintained by the U.S. Department of Justice. Austen confirmed that he had not personally observed the locations of the cell phone towers for this case.[31] Instead, Austen relied on the federal database and explained that "the cell phone providers are required by law to provide that [information] straight to the Department of Justice website." He then confirmed that he is able to determine whether a particular cell phone is "pinging off" a particular tower by correlating the phone's call detail records obtained from the service provider with the records from the federal database. The trial court ruled that Austen could testify regarding "[t]he locations of the cell towers, [and] the pinging of the cell phone off a particular tower" without violating *Sanchez*.

At trial, Serrano and the other defendants raised a continuing objection to Austen's testimony on RF coverage on "hearsay and foundational grounds." Austen testified that, in analyzing the cell phone data and RF coverage in this case, he uploaded the call detail records from the providers into a program called ZetX. That program mapped the data, showing where the cell phone "ping[ed]" different cell phone towers, and based on this information Austen estimated the coverage area. Austen next discussed the various exhibits displaying the coverage areas around cell phone towers to which each of the

---

[31] The following day, during cross-examination, Austen testified that he had subsequently visited "the three [cell tower locations] that were important" to the case.

defendants' phones had connected at various times both before and after the crime. The trial court then overruled defendants' hearsay and foundational objections.

### b. *Applicable legal standards*

An expert is permitted to relate hearsay statements regarding general background information that contributes to his or her opinion, but not testimonial hearsay statements that present case specific facts. (*Sanchez, supra,* 63 Cal.4th at p. 675; see *Crawford v. Washington* (2004) 541 U.S. 36; *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305.) Pursuant to *Sanchez*, an expert may testify about "background information regarding his knowledge and expertise and premises generally accepted in his field." (*Sanchez, supra*, 63 Cal.4th at p. 685.) An expert may not, however, "relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception." (*Id.* at p. 686.)

In *People v. Veamatahau* (2020) 9 Cal.5th 16 (*Veamatahau*), the California Supreme Court clarified the approach trial courts must use in determining whether expert testimony is case-specific, explaining "[t]he focus of the inquiry is on the information conveyed by the expert's testimony, not how the expert came to learn of such information. Thus, regardless of whether an expert testified to certain facts based on composite knowledge 'acquired from sources too numerous to distinguish and quantify' or if the expert simply looked up the facts in a specific reference as part of his or her duties in a particular case, the facts remain the same. The background or case-specific character of the information does not change because of the source from which an expert acquired his or her knowledge." (*Id*. at p. 30.) In *Veamatahau*, the expert witness testified that pills found in defendant's possession contained controlled substances. (*Id.* at p. 23.) On cross-examination, the expert testified that he did not test the pills themselves but relied on a federal database describing distinctive imprints the federal Food and Drug Administration (FDA) requires be placed on pharmaceutical products which identify the controlled substances they contain. (*Ibid*.) On appeal, the California

31

Supreme Court concluded that the expert's testimony did not fall afoul of *Sanchez* because the federal database on which the expert relied for general information to form an opinion, while hearsay, is not case-specific. (*Veamatahau*, *supra*, at p. 27.)

### c. Analysis

In this case as well, the federal database on which Austen relied for the locations of cell phone towers in Salinas was not case-specific evidence. As Austen made clear, that database includes location information for *all* cell phone towers throughout the country, not just those in Monterey County,[32] and cell phone service providers are required by statute to provide this information to the Department of Justice. Upon obtaining the tower location information and the cell phone data records obtained from defendants' service providers,[33] Austen utilized a proprietary program to plot the locations of the relevant cell towers. Austen also confirmed on cross-examination that, although he had not personally verified the tower locations before his first day of testimony, he had in fact driven to the three most relevant towers before he testified a second day, thereby curing any possible hearsay problems.

Serrano also seeks to distinguish *Veamatahau* by noting the drug database in that case "contained information applicable to all pills manufactured for distribution in the United States" whereas in this case "the cell tower location database revealed substantial

---

[32] Serrano seeks to distinguish the drug database in *Veamatahau* from the cell tower database in this case by asserting that the former "contained information applicable to all pills manufactured for distribution in the United States" whereas the latter "did not apply to all cell phone towers in the United States." While Austen's testimony was not explicit on the database's scope, the clear implication is that the federal database includes all cell phone towers in the United States. Austen only downloaded the data for the cell phone towers in and around Salinas, just as the expert in *Veamatahau* looked up "tablet[s] that ha[ve]—in this case GG32—or 249 [as an imprint]" rather than the entire universe of imprints available in the FDA database. (*Veamatahau*, *supra*, at p. 23.)

[33] The parties stipulated to the admission of this information as business records under Evidence Code section 1271.

information about the particular events being tried—the defendants' locations at various times—and contained information about the very cell towers that the defendants contacted in this specific case." This is inaccurate. The cell phone tower location was useful only when combined with Serrano's cell phone data records, which provided the time and place of the connection as well as the direction of the connection between the phone and the tower. The case-specific facts were derived from the records which Serrano stipulated were admissible as business records.

Accordingly, we conclude that Austen's testimony was admissible based on his personal knowledge of the location of the three most relevant cell phone towers, his reliance on a federal database identifying the location of cell phone towers, as well as the cell phone records which Serrano stipulated were admissible business records pursuant to Evidence Code section 1271.

### 4. Gang expert testimony regarding targeting non-gang members

Serrano next argues that the trial court erred in admitting testimony from the prosecution's gang expert explaining how shooting or killing a non-gang member benefits a gang because that evidence was unduly prejudicial under Evidence Code section 352 and violated his due process rights. The Attorney General counters that Serrano has forfeited this argument by not raising a timely and specific objection at trial. Alternatively, the Attorney General argues the testimony was admissible as it was generalized background information and was more probative than prejudicial since there was evidence the victims were not rival gang members.

### a. Additional background

Serrano moved in limine to limit any gang expert testimony on the historical background of Sureño and Norteño gangs. The trial court ruled that it would allow testimony on this subject. However, the court advised that it would "be watching for any [Evidence Code section] 352 issues[]" during that testimony and would entertain any such objections made by the defense.

33

At trial, the prosecution's gang expert testified as to how a shooting would generally benefit a gang, stating that such an act: 1) enhances the status of the gang member who commits it; 2) serves as an initiation into the gang, increasing its membership; and 3) bolsters the reputation of both the gang and the shooter in the community. When the prosecutor asked whether gang members "kill or only to try to kill or shoot at just other gang members," Arellano's counsel objected on relevance grounds. The court excused the jury and took a recess while the parties discussed the matter off the record.[34]

When trial resumed, the trial court overruled the objection, stating, "[i]t's a limited area of relevance." The gang expert then testified that gang members do not just target other gang members and, depending on the circumstances, killing or shooting a non-gang member can benefit the gang. According to the gang expert, such an act intimidates members of the community, thus making them less likely to report crimes or cooperate with the police.

### b. Forfeiture

We first examine whether Serrano forfeited his claim of error by failing to assert a timely and specific objection to admission of the testimony in the trial court. (*People v. Demetrulias* (2006) 39 Cal.4th 1, 22 (*Demetrulias*).) Evidence Code section 353, subdivision (a), permits reversal of a judgment because of the erroneous admission of evidence only if an objection to the evidence was "timely made and so stated as to make clear the specific ground of the objection." (Evid. Code, § 353, subd. (a).) The California Supreme Court " ' "ha[s] consistently held that the 'defendant's failure to make a timely and specific objection' on the ground asserted on appeal makes that ground not cognizable." ' " (*Demetrulias*, *supra*, 39 Cal.4th at p. 20.) " 'When the nature of a question indicates that the evidence sought is inadmissible, there must be an

---

[34] After the jury was excused for the day, the parties did not make a record of this discussion.

34

objection to the question; a subsequent motion to strike is not sufficient.' " (*Id.* at p. 21.) "The purpose of this rule 'is to encourage a defendant to bring any errors to the trial court's attention so the court may correct or avoid the errors and provide the defendant with a fair trial.' [Citation.] Thus, an objection will be deemed sufficient so long as it 'fairly apprises the trial court of the issue it is being called upon to decide.' " (*People v. Carrillo* (2004) 119 Cal.App.4th 94, 101.) "Moreover, '[a] motion to strike must be directed with precision to the matter sought to be stricken. [Citation.] A motion to strike out inadmissible evidence may properly be denied where it is general and embraces evidence which is admissible as well as that which is inadmissible.' " (*Rayii v. Gatica* (2013) 218 Cal.App.4th 1402, 1414.)

Here, Arellano's counsel, not Serrano's, raised a relevance objection to the prosecutor's question about gang members possibly attacking non-gang members. Even assuming Serrano joined in that objection at the bench conference, there is nothing in the record indicating that anyone raised an objection to this testimony based on Evidence Code section 352.[35]

The relevance objection failed to fairly apprise the trial court about what testimony Serrano believed was objectionable. Under these circumstances, we conclude that the objection, even assuming he joined in it, did not adequately preserve his current claim for appellate review.

### c. The evidence was more probative than prejudicial

Assuming Serrano did not forfeit his Evidence Code section 352 argument, we would still find on the merits that the evidence was more probative than prejudicial.

---

[35] Even had Serrano joined in Arellano's relevance objection, he may not argue on appeal that his due process rights were violated because the trial court should have excluded the evidence under Evidence Code section 352. (*People v. Partida* (2005) 37 Cal.4th 428, 436.)

The gang expert's testimony explained why Sureño gang members, after arriving at an apartment complex known to be a locus of Norteño activity, would fire at a group of people congregated in that complex, even without any clear indication that all of those people were gang members.[36]

In addition, the challenged testimony was not particularly prejudicial, as it was brief, not cumulative, and not particularly inflammatory. The actual facts of the shooting were more inflammatory than generalized testimony of how gang members will attack non-gang members to benefit their gang.

Serrano notes that, although the three victims denied gang membership when they testified, they admitted such membership to Gibson. Even if there was some evidence to show that Serrano knew these three men were Norteños, he and his co-defendants indiscriminately fired at least 23 rounds towards an apartment complex without regard to whether anyone else in the line of fire could be hit.

On these facts, the trial court did not err in admitting this testimony even had Serrano raised an objection under Evidence Code section 352.

### 5. Evidence of Serrano's jail housing classification

Finally, Serrano claims the trial court erred in allowing a jail classification officer to testify that Serrano and his codefendants were housed in a Sureño unit of the Monterey County jail while awaiting trial. He argues the testimony was unduly prejudicial as it undermined the presumption of innocence, it was cumulative of the other evidence establishing his Sureño gang membership, and it violated his Fifth Amendment privilege.

### a. Additional background

At trial, Monterey County Deputy Omar Rubio testified that he was assigned to the classification unit of the Monterey County jail. According to Rubio, the classification unit is tasked with ensuring that inmates were placed in a housing unit that would keep

---

[36] Of the three victims, only Doe was wearing an article of clothing, i.e., a red hat, that a Sureño gang member would associate with a Norteño.

them safe from assault by other inmates. For their own safety, certain inmates such as sex offenders and gang members, including their associates, friends, and sympathizers, are kept separate from other inmates. In order to make the best housing decision, classification officers try to gather as much information as they can, starting at intake. After the initial screening, inmates who may need to be placed in housing apart from the general population are interviewed by a classification officer. Rubio testified that the purpose of their interviews was not to "validate" gang members but simply to make sure the inmates would be safe in their housing assignment. For example, even an inmate who is not a gang member but is "simply an associate, a family member of a gang member, a sympathizer, but someone that's still in good enough standing" will be placed in the corresponding gang housing unit.

Rubio testified that the Monterey County jail has two units for inmates who had been classified as members or associates of Sureño street gangs. One unit, called "C pod[,]" was for maximum security and housed inmates charged with more serious crimes, whereas the other, "E pod[,]" was medium security.

Rubio testified that he was personally aware that Serrano was housed in the C pod at the jail.[37] To his knowledge, Serrano had not been assaulted while he was in custody and, according to Rubio, this indicated that Serrano was in good standing with Sureños.

Prior to deliberations, the trial court instructed jurors with CALCRIM No. 303 on limited purpose evidence, and specifically referred to the evidence introduced regarding Serrano's custodial status. In closing argument, in summarizing the evidence proving Serrano's active participation in a criminal street gang, the prosecutor mentioned Serrano's "jail housing status and where he's currently lodged" along with his prior contacts with law enforcement, his tattoos, photos of him throwing gang signs, and his rap video.

---

[37] The trial court overruled Serrano's objections, based on the Fifth and Sixth Amendment, to this testimony.

### b. Analysis

With respect to Serrano's argument that Rubio's testimony on his gang affiliation was cumulative, we conclude that Serrano has forfeited that claim on appeal as he did not timely raise that objection at trial.  (*Demetrulias*, *supra*, 39 Cal.4th at p. 22.)  Accordingly, we will consider only his contentions that the testimony undermined the presumption of innocence under the Sixth Amendment and violated his Fifth Amendment privilege against self-incrimination.

As to Serrano's Sixth Amendment claim, he asserts that Rubio's testimony was analogous to his wearing jail clothes during trial, citing *People v. Valdez* (2004) 32 Cal.4th 73, 121 (*Valdez*).  In his view, Rubio's testimony was both "cumulative and minimally probative" in light of all the other evidence showing that he was a Sureño gang member, such as the photos, video, and text messages seized from his phone.

We disagree that the evidence was not probative, particularly as Serrano was being tried for the crime of active participation in a criminal street gang (§ 186.22, subd. (a); count 8).  In *Valdez*, the California Supreme Court made clear that "the mere fact that the jury is made aware of a defendant's custodial status does not deprive the defendant of his constitutional rights." (*Valdez*, *supra*, 32 Cal.4th at p. 121.)  Before deliberating, the jury was instructed that "[a]ctive participation means involvement with a criminal street gang in a way that is more than passive or in name only," but also that the offense does not require proof of actual gang membership.  Rubio testified that he knew Serrano was housed in C pod, a Sureño housing unit, and that he had not been assaulted.  This testimony was not conclusive proof that Serrano was a Sureño gang member, but formed the basis of Rubio's opinion that Serrano was, at a minimum, affiliated with, sympathized with, or was friends with Sureño gang members and was in good standing with such members.  From these facts, the prosecutor could argue that the jury could infer Serrano's active participation in a criminal street gang.  The disclosure of Serrano's custodial status did not violate his Sixth Amendment rights.  (*Valdez*, *supra*, 32 Cal.4th at p. 121.)

38

Serrano's claimed Fifth Amendment violation is equally without merit. Citing *People v. Elizalde* (2015) 61 Cal.4th 523 (*Elizalde*), Serrano contends that Rubio's testimony about the classification process "led to the unavoidable conclusion" he "admitted" being a Sureño gang member to jail staff. We find *Elizalde* distinguishable.

In *Elizalde*, *supra*, 61 Cal.4th 523, the California Supreme Court determined that questions about gang affiliation during a jail classification booking interview are reasonably likely to elicit incriminating responses, making the interview a custodial interrogation under the Fifth Amendment. (*Elizalde*, at pp. 527, 541; U.S. Const., 5th Amend.) As a custodial interrogation, the *Elizalde* court found that answers to such questions are inadmissible in the prosecution's case-in-chief unless preceded by a *Miranda* advisement. (*Elizalde*, at pp. 527, 541.) The court made clear, however, that "it is permissible to ask arrestees questions about gang affiliation during the booking process. Jail officials have an important institutional interest in minimizing the potential for violence within the jail population and particularly among rival gangs, " 'which spawn a climate of tension, violence and coercion.' " Instead, it is "defendant's answers to the unadmonished gang questions" that are "inadmissible in the prosecution's case-in-chief." (*Elizalde*, *supra*, 61 Cal.4th at p. 541, internal quotation and edit marks omitted.)

In this case, nothing Serrano said to Rubio (who did not testify that he personally interviewed Serrano) or to the intake officer were introduced at trial. Rubio testified about the intake and classification process in general before stating that Serrano was housed in the C pod and had not been assaulted. Rubio did not testify that C pod was restricted to active Sureño gang members, but that the unit also housed associates, friends, family members, and sympathizers, meaning the jury could just as easily infer that Serrano had claimed to fall into one of those other categories.

As Serrano cannot show that any statement, he made to jail officials was admitted in evidence, the assertion that Rubio's testimony violated his Fifth Amendment privilege against self-incrimination must fail.

### 6. Cumulative Error

Serrano contends that the cumulative effect of the purported errors discussed above warrants reversal of the judgment. As we have found no individual error, we reject his cumulative error argument.

### 7. Serrano is entitled to resentencing under amended sections 1170 and 1385

Serrano raises two additional claims challenging his sentence and seeking remand in light of changes in law which took effect January 1, 2022. First, he claims he is entitled to resentencing in light of Senate Bill No. 567 (2021-2022 Reg. Sess.) (Sen.Bill. 567) which amended section 1170 to provide, in relevant part, that the low term should be the presumptive term for youthful offenders. (§ 1170, subd. (b)(6)(B); see § 1016.7, subd. (b) [defining "youth" as a person under age 26 on the date the offense is committed].) Second, he argues he is entitled to be resentenced pursuant to section 1385, as amended by Senate Bill No. 81 (2021-2022 Reg. Sess.) (Sen.Bill. 81). That amendment sets forth "factors that the trial court must consider when deciding whether to strike enhancements from a defendant's sentence in the interest of justice." (*Sek, supra,* 74 Cal.App.5th 657at p. 674.) The Attorney General concedes that Serrano is entitled to be resentenced under the operative versions of section 1170 and section 1385, and we agree.

As we discuss below, we are remanding the matter for possible retrial of count 8 and the gang enhancements alleged in connection with counts 1 through 7. At resentencing, the trial court should apply current law, including sections 1170 and 1385.

### B. Ceja's appeal and habeas petition

In his appeal, Ceja argues that he received ineffective assistance of trial counsel, a claim he originally brought by way of an unsuccessful motion for new trial. Ceja expressly "does not challenge the [trial] court's exercise of discretion in denying the

motion as the motion failed to present instances of deficient performance to consider."[38]
He instead seeks to raise those "specific instances of deficient performance" by his trial
counsel for the first time on appeal.

Ceja's petition for a writ of habeas corpus, supported by several sealed
declarations, including a declaration from trial counsel, also raises claims of ineffective
assistance of counsel and we address that petition by separate order. The additional
materials presented in the habeas petition—which we cannot consider in resolving the
appeal—convince us it should be examined in the trial court. (See *People v. Snyder*
(1993) 14 Cal.App.4th 1166, 1171 ["[W]hen the appellate record does not, or cannot,
reflect the grounds for a claim of ineffective assistance of counsel, the issue is
appropriately raised by a petition for writ of habeas corpus. [Citation.]."] We will
therefore issue a separate order to show cause returnable to the trial court.

### 1. Overview of Ceja's claims on direct appeal

Ceja claims that counsel rendered ineffective assistance in the following ways: 1)
counsel elicited testimony from the firearms database technician that he was certain some
of the casings recovered from the scene of the shooting matched the weapon seized from
Ceja's vehicle; 2) counsel failed to preclude similar testimony by a tool marks expert; (3)
counsel failed to object to the tool marks expert's hearsay testimony that his supervisors
had approved and agreed with the conclusions in his report; 4) counsel failed to object to
the investigating detective's testimony about distinctive features of Ceja's SUV that
matched features of an SUV shown in the surveillance video just before the shooting; 5)
counsel failed to object to testimony about his tattoos under Evidence Code section 352
as more prejudicial than probative; 6) counsel failed to adequately prepare his alibi

---

[38] As noted, *ante*, in footnote 3, because Ceja has not contested the order denying
his motion for a new trial, we do not consider any of the materials, including declarations
filed under seal, he submitted in support of that motion as part of the record in his direct
appeal.

witness or investigate his alibi defense; and 7) counsel was "emotional and bizarre" in her opening and closing statements. For the reasons discussed below, we conclude that, based on the record in his direct appeal, Ceja has not shown constitutionally deficient performance by trial counsel because the record demonstrates a rational tactical purpose underlying each of the acts or omissions that Ceja challenges on appeal.

### b. Applicable legal principles

To prevail on an ineffective assistance of counsel claim, a defendant must establish that trial counsel's performance was deficient, and that defendant suffered prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 [104 S.Ct. 2052, 80 L.Ed.2d 674] (*Strickland*).) The deficient performance component of an ineffective assistance of counsel claim requires a showing that "counsel's representation fell below an objective standard of reasonableness" under prevailing professional norms. (*Id.* at p. 688.) Regarding prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Id.* at p. 694.)

"On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

### c. Analysis

Ceja argues that his trial counsel rendered ineffective assistance through her: 1) cross-examination of Mark Babione, one of two witnesses who testified about firearms; 2) failure to bring an in limine motion precluding Babione and Scot Graham Armstrong, an expert in tool mark and firearm identification, from opining that bullet casings found at the scene had been fired by the weapon associated with Ceja; and 3) failure to object to

Armstrong's testimony that his supervisors had reviewed his report and agreed with his conclusions.

### i. Trial counsel's examination of Babione

Babione, a "crime gun intelligence coordinator" for the Bureau of Alcohol, Tobacco, Firearms, and Explosives testified that he had been assigned to the Salinas Police Department to work with a ballistics database known as the Integrated Ballistics Identification System (IBIS), that tracks firearms and ammunition, similar to a database used for fingerprints. Ceja argues that trial counsel elicited improper opinion testimony from Babione establishing that he was certain that some of the casings left at the shooting had been fired by the .40-caliber Glock 23 pistol that was discovered in Ceja's possession.

We are not persuaded that counsel's questioning of Babione, considered as a whole, demonstrates deficient performance by counsel. She began her cross-examination by noting that Babione's examination of the shell casings was used to identify firearms that *could* have been used in the shooting, not to identify a match between a particular firearm and the casings found at the scene. Counsel then elicited Babione's admission that he had tested only some of the casings found at the scene, that the database he used did not encompass all the particular firearms that used .40 caliber ammunition, and finally emphasized that Babione could only use the phrase "in all likelihood" to support his opinion that the casings were "fired by the same firearm." "[N]ormally the decision to what extent and how to cross-examine witnesses comes within the wide range of tactical decisions competent counsel must make. [Citation.] 'Even where defense counsel may have " 'elicit[ed] evidence more damaging to [the defendant] than the prosecutor was able to accomplish on direct' " [citation], we have been "reluctant to second-guess counsel" [citation] where a tactical choice of questions led to the damaging testimony.' [Citation.]" (*People v. Cleveland* (2004) 32 Cal.4th 704, 746.)

On this record, counsel's examination sought to undermine Babione's credibility and point the jury toward the possibility that another weapon could have fired the casings discovered at the scene. This was a reasonable tactic under the circumstances and does not show counsel was ineffective.

### ii. Failure to move in limine to preclude opinion evidence by a qualified expert in tool mark and firearm identification

Ceja next argues that trial counsel was ineffective for failing to move to preclude testimony by Armstrong, a tool mark and firearm identifications expert, that casings test fired from Ceja's gun matched some of the casings recovered from the shooting. We disagree that this could amount to ineffective assistance because the expert in question was qualified to render such an opinion and any objection to his testimony on this matter would have been overruled.

After the prosecution voir dired Armstrong about his work experience, his training, and his experience testifying as an expert, the prosecution moved to designate Armstrong "as an expert in the area of [tool mark] and firearm identifications" without objection from any of the three defense counsel.

On direct examination, Armstrong testified about how he compared tool marks on the casings recovered from the crime scene with the casings recovered from test firing the firearms seized from Ceja and Serrano. According to Armstrong, individual characteristics he observed on the casings from the shooting would not be present in other guns of the same make and manufacturer. Based on his knowledge and experience Armstrong described his conclusion that the casings from the shooting and those test-fired from Ceja's gun were a match.

It is well-settled that "[r]epresentation does not become deficient for failing to make meritless objections." (*People v. Ochoa* (1998) 19 Cal.4th 353, 463 (*Ochoa*).) In this case, it is clear that any attempt to preclude Armstrong's testimony would have been futile. This conclusion is further supported by the fact that neither Serrano's nor

44

Arellano's defense counsel apparently believed there was any arguable merit bringing such an in limine motion on behalf of their clients.

*People v. Azcona* (2020) 58 Cal.App.5th 504 (*Azcona*) is not of assistance to Ceja. In that case, the expert (coincidentally Armstrong as well) was comparing casings from two crime scenes and opining that those casings were fired by the same (unrecovered) weapon. (*Id*. at p. 509; see *id*. at p. 518 (conc. opn. of Greenwood, P.J.).) The concurring opinion, which would have precluded all expert testimony regarding tool marks, contended there was no evidence of general acceptance by the scientific community of tool marks as a method to compare firing pin marks on shell casings. (*Id*. at p. 525 (conc. opn. of Greenwood, P.J.).) However, it was the fact that there was no weapon recovered which could be test-fired that was critical to distinguish the technique in *Azcona* from the reliable and generally accepted technique discussed in *People v. Cowan* (2010) 50 Cal.4th 401 (*Cowan*). The concurring opinion in *Azcona* noted that "Armstrong did not have the gun used in the offenses, and he compared two shell casings with each other, not a bullet with a barrel. The methods bear some abstract similarity in that both involved ' "essentially a tool mark type of examination when one looks at impressed or striated materials, marks, and that is not a new technique' (*Cowan*, *supra*, 50 Cal.4th at p. 470), but the similarity ends there." (*Azcona*, *supra*, 58 Cal.App.5th at pp. 525–526 (conc. opn. of Greenwood, P.J).) In this case, Armstrong had the weapon seized from Ceja to test-fire and could thus directly compare the casings.

### iii. References to supervisors' agreement with expert report

Finally, Ceja argues his trial counsel was ineffective for not objecting when Armstrong testified that his report had been reviewed by his supervisors and that those supervisors agreed with his conclusions.

The first such instance occurred when the prosecutor was establishing a foundation for Armstrong to testify about his report. The prosecutor asked how Armstrong's report was generated and Armstrong explained that after he drafted the

45

report, it was reviewed by another qualified examiner, and the revised draft report was reviewed again by the laboratory supervisor.  When Armstrong added, "[s]o the three people have about 90 years of experience in the field[,]" there was no objection from any defense counsel.

The next two instances were elicited by Arellano's counsel, who asked Armstrong why he did not have just one photograph that showed both the tool marks from the gun and the fired cartridge case.  After Armstrong explained he probably had photographed the markings on the gun using a handheld camera, Arellano's counsel challenged Armstrong that "the jury has to ... take your word for it; correct?"  Armstrong responded that his "comparison [] was reviewed by two other people that we have an identification."

On recross-examination, Arellano's counsel again confronted Armstrong about the subjective nature of his conclusions, to which Armstrong responded that that "a chain of reviewers[,]" who were also "competent forensic scientists" had agreed with him.

While Armstrong's references to his supervisors' review of his report and their agreement with his conclusions were subject to an objection as case-specific hearsay, the failure to object does not rise to constitutionally deficient representation.  (*Azcona*, *supra*, 58 Cal.App.5th at p. 514; *Sanchez, supra,* 63 Cal.4th at p. 675.)

As a threshold matter, Armstrong's most direct testimony about what his supervisors did was elicited on cross-examination by co-defense counsel, and none of the three defense attorneys raised an objection when that testimony came out.  Not objecting was a reasonable tactical decision because Armstrong's testimony could reasonably be seen by the jury as defensive in that he needed to buttress the accuracy of his report by these references to other authorities.

"[W]hen a testifying expert offers an independently formed opinion, erroneously admitted evidence that a supervisor agrees with the opinion will often be harmless." (*Azcona*, *supra*, 58 Cal.App.5th at p. 515.)  In contrast to this case, the evidence was not found harmless in *Azcona* because "the expert's independent opinion was itself

46

inadmissible" and, thus, "[t]aken together," the expert's conclusion "and the hearsay statements about the supervisor approval gave the impression that the expert's opinion was entitled to more weight than it would otherwise deserve." (*Ibid.*)

Here, Armstrong's opinion that some of the casings at the scene were fired by Ceja's weapon was admissible. (*Cowan*, *supra*, 50 Cal.4th at pp. 470-471.) In addition, significant circumstantial evidence aside from Armstrong's report linked Ceja to the crime, including his phone records and the surveillance video of his vehicle at the crime scene. Armstrong's brief references to his supervisor's opinions were not so pivotal or decisive that their admission unduly swayed the jury.

### iv. Gibson's testimony about Ceja's Denali SUV

Ceja also contends that trial counsel was ineffective for failing to object to Gibson's testimony that Ceja's vehicle was "unique" because Gibson lacked the expertise to render such an opinion.

Ceja was driving a GMC Yukon Denali SUV, registered to his address, when he was arrested after the shooting. Gibson testified that, in investigating the shooting, he retrieved and viewed a surveillance video from a nearby market which showed "a white GMC Yukon Denali … enter[] … the view of the camera moments before the shooting." According to Gibson, he believed the SUV was possibly related to the shooting because in the video "I actually observed that vehicle slow down and pull to the right-hand curb line prior to the entry or the driveway to the complex."

As Gibson began to describe the vehicle's distinctive features, Serrano's counsel objected based on lack of foundation, and the trial court sustained the objection. The prosecutor then asked Gibson a series of questions to demonstrate his familiarity "with the Yukon model Denali in the mid-to late-2000s or, I guess, early 2000, mid-2000 models[.]" Gibson testified that he researched that model of vehicle during the investigation and had personally viewed such vehicles. He then identified what he found distinctive about the vehicle shown in the video: "You have the sunroof and the white

47

running boards. It lacks the silver metallic strip along the passenger and driver's side door. [¶] And it's cut off in there, but if you look at the front bumper of the vehicle it's actually completely painted white. On a regular Yukon that is, like, silver or metal, silver metal color. And in this video it's actually white and the Yukon Denali and the colors it comes in will paint it all the way around the bumper."

As a threshold matter, Gibson's observations did not necessarily require qualification of an expert as they were not "[r]elated to a subject that [was] sufficiently beyond common experience." (Evid. Code, § 801, subd. (a).) It does not require an expert to notice that a vehicle has a sunroof, tinted windows, a painted bumper, or other special features.

Ceja's claim of error must be rejected as this is not a circumstance in which there is no satisfactory explanation for failing to object. (*Mendoza-Tello*, *supra*, 15 Cal.4th at p. 266.) Any such objection would have invited further examination into the specifics of Gibson's research into GMC Yukon Denali SUVs which would have reinforced the conclusion that the features of Ceja's vehicle were distinctive and it was unlikely that another GMC Yukon Denali SUV appeared on the video. Accordingly, we cannot say the failure to object demonstrates deficient performance or was constitutionally ineffective. (*Strickland*, *supra*, 466 U.S. at p. 688-689.)

### v. Expert testimony about gang-related tattoos

Ceja claims that his counsel rendered ineffective assistance by failing to object to the testimony by the prosecution's gang expert, Justin Salinas, that gang tattoos were significant to show that gang members had committed shootings or violent acts. Specifically, Ceja claims his counsel should have interposed objections when: 1) the prosecutor elicited background information about gang tattoos; 2) Arellano's counsel elicited information about the meaning of specific tattoos; and 3) Arellano's counsel argued in closing argument that Arellano had no tattoos, in contrast to Ceja, and repeated Salinas's testimony that Ceja's tattoo was "this Salinas symbol . . . that signifies either

48

shooting or hurting specifically a Norteño." Because any objection to this testimony would have been overruled, the failure to object cannot amount to ineffective assistance of counsel. (*Ochoa*, *supra*, 19 Cal.4th at p. 463.)

In *Sanchez*, *supra*, the California Supreme Court held that expert testimony about the significance of particular gang tattoos was admissible "background information." (*Sanchez*, *supra*, 63 Cal.4th at p. 677, 685.) Salinas's testimony about the meaning of Ceja's tattoos was within his expertise and, thus, admissible. (Evid. Code §§ 720, 801, 802; *People v. Valencia* (2021) 11 Cal.5th 818, 835.)

Salinas testified about Sureño tattoos in general, and Ceja's tattoos in particular, based on photographs that were independently admitted. (*Sanchez*, *supra*, 63 Cal.4th at p. 677, 685.) He confirmed that gang tattoos are significant, especially "hood specific tattoos or other types of symbols that come out of the prison system." As to the photos of Ceja's tattoos, Salinas testified about their symbolism and how he relied on them in concluding that Ceja was an active participant in the Sureño criminal street gang at the time of the crime. According to Salinas, a tattoo of a broken star or a star with holes in it would sometimes indicate that the person has shot a Norteño.

In Arellano's counsel's closing argument, he merely referenced Salinas's admissible testimony that gang tattoos have to be earned as proof that Arellano, who had no tattoos, was not a gang member.

Because the argument accurately reflected admissible evidence, there was no basis for Ceja's trial counsel to object. (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1331.)

Ceja's alternative argument that counsel should have objected to the argument as impermissible character evidence under Evidence Code section 1101, subdivision (a), or as unduly prejudicial without probative value under Evidence Code section 352, is also meritless. Even if such objections had merit, Ceja cannot demonstrate counsel had no tactical reason for failing to assert them. It is clear from the record that Ceja's defense

strategy was not based on refuting his gang affiliation but rather to show that he could not have been present when the shooting occurred.

Furthermore, both the nature and meaning of Ceja's tattoos were highly probative because the charges arose from a gang-related shooting. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049 (*Hernandez*).) "Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime." (*Ibid.*)

### vi. Trial counsel's examination and investigation of Ceja's alibi witness

Ceja claims that his counsel rendered deficient performance by not fully investigating how his alibi witness, Cristobal Gonzalez, would establish the means by which he "clock[ed]-in" at work on the day of the murder. In Ceja's view, if defense counsel knew Gonzalez could establish that Ceja could clock-in for his shift by telephone, but only from a telephone at his work site, then his counsel was deficient for not eliciting such testimony more clearly at trial, thus strengthening his alibi defense. Alternatively, if counsel had known that it was possible for Ceja to have clocked-in remotely from any telephone, rather than at the worksite, then counsel was deficient for attempting to present an alibi defense at all.

Ceja's alibi defense was that he was at work in Morgan Hill shortly after the shooting, and to that end, the defense introduced Ceja's work records showing he had "clocked in" to his job at 9:59 p.m. In support of its case, the prosecution had introduced cell phone records showing that Ceja was actually near the apartment complex at the time of the shooting and was still in Salinas at 9:19 p.m. The defense sought to show that it was impossible for Ceja to have arrived in Morgan Hill within 40 minutes of leaving Salinas. In rebuttal, the prosecution's investigating officer, John Coletti, testified that on two test drives from Salinas to Ceja's job site in Morgan Hill, both beginning at 9:19

50

p.m., he arrived within 37 minutes with his cruise control set at 65 miles per hour and within 33 minutes when he set it to 70 miles per hour.

During the defense case, Ceja's counsel first called, Gloristela Morales, the custodian of records for Ceja's employer. Through Morales, trial counsel introduced a timekeeping report for "Carlos Delgado" on April 18, 2016, the day of the shooting, as a business record. This record indicated that "Carlos Delgado" had clocked in to work at 9:59 p.m. that evening. On cross-examination, Morales testified that employees "have to go to a specific area" where the supervisor placed a time clock to "clock in."

The next defense witness, Cristobal Gonzalez, testified that he was the area supervisor when Ceja worked at a site in Morgan Hill, and he knew Ceja as "Carlos Delgado." Gonzalez testified on cross-examination that he did not specifically remember working on April 18, and, regardless, would not have witnessed Ceja clock in since he was not his direct supervisor.

On redirect, Ceja's counsel elicited Gonzales's admission that he could not remember where he was on April 18, 2016, only "[b]ecause it's been almost two years." Counsel then asked more questions about the "clock in" procedure, presumably to rebut any inference that someone else might have been able to clock in for Ceja. Gonzales said that an employee "would clock in or punch in through the telephone, a company telephone" and enter a code. If the telephone system was not working, the employee would have to sign in on arrival. Although the clock in system presently required the employee's fingerprint, defense counsel confirmed that the fingerprint clock in was not in place when Ceja worked there.

On recross-examination, Gonzalez testified that Ceja's time sheet showed that 9:59 p.m. was "the time that [Ceja] called into the phone number to clock in," as Gonzalez had just described.

Ceja appears to claim that his counsel's performance was deficient because, without proper investigation, she asked Gonzalez questions that prompted him to testify

51

that an employee could clock-in by telephone, thereby weakening his alibi defense. On the other hand, if the clock-in system required use of a company phone, then, his counsel was deficient in not making clear that Ceja had to be at work to clock in.

As a threshold matter, the record shows that the reason counsel called Gonzalez was to establish that Ceja was "Carlos Delgado," the employee on the timecard who clocked in at 9:59 p.m. the night of the shooting. When Gonzalez admitted on cross-examination that he would not have observed Ceja clock in as he was not his direct supervisor, defense counsel sought to rebut the inference that someone might have clocked in for Ceja by inquiring further into the procedure on redirect. On its face, the decision to call Gonzalez as a witness was rational and, in fact, necessary as otherwise there would be no evidence to tie Ceja to the timecard ostensibly showing when he arrived at work that night. Consequently, we do not find that such actions indicate deficient performance by counsel.

### vii. Trial counsel's opening statement and closing argument

Ceja asserts that trial counsel's conduct was "emotional and bizarre at times."

At the outset of her opening statement, trial counsel talked about circumstantial evidence. Just before informing jurors of her intention to present an alibi defense, she stated: "So maybe now you want to know what [Ceja] was doing, where he was or what his story is about April 18. [¶] Well, in order to have a story to tell you, my client has to tell me where he was and what he was doing. And he can't do that. But what we do know is he wasn't there. [¶¶] But what we do know is that [Ceja] was at work that night. What we do know is that he checked in at 10, because there's a time card. [*Sic*.] And he checked out at 6:30 a.m. We do know that. [¶] And, by the way, [Ceja] works in Morgan Hill."

Next, Ceja claims that in closing argument, trial counsel argued against his interest by stressing the importance of the weapon found in his possession. Finally, the court interrupted trial counsel when she made the following statement to the jury, "What you

saw here the last two weeks was a person [counsel] who underestimated the difficulty in this matter and overestimated her ability—." At this point, the trial court asked the parties for a sidebar conference, following which the court instructed jurors "to disregard that last comment."

Again, the record shows that counsel's decisions to focus on Ceja's alibi defense and the circumstantial nature of the evidence—just as Serrano's counsel did—were reasonable tactical choices. Her attempt to suggest to the jury that she was not up to the task of defending Ceja was also a rational tactic in seeking to have the jury blame her, rather than her client, for not presenting Ceja's case as well as the prosecution might have presented theirs.[39]

### C. Ceja's indeterminate sentencing on counts 1 through 3

On September 20, 2019, the court imposed a total sentence of 110 years to life on counts 1 through 3, as follows: (1) on count 1, the court imposed a sentence of 40 years to life in prison, consisting of a term of 15 years to life due to the gang enhancement (§ 186.22, subd. (b)(5)), plus a consecutive term of 25 years to life due to the firearm enhancement (§ 12022.53, subd. (d)); and (2) on counts 2 and 3, the court imposed identical consecutive terms of 35 years to life in prison, consisting of 15 years to life terms due to the gang enhancement (§ 186.22, subd. (b)(5)), plus consecutive terms of 20 years to life due to the firearm enhancement (§ 12022.53, subd. (c).) These sentences are repeated in the abstract of judgment.

---

[39] Finally, Ceja argues that the cumulative effect of the errors by trial counsel warrant reversal even if each error, standing alone, would not be sufficiently prejudicial. (*In re Gay* (2020) 8 Cal.5th 1059, 1087.) As we have determined that the record shows a rational tactical purpose underlying each of the claimed errors or omissions, there can be no cumulative error.

Citing *People v. Wong* (2018) 27 Cal.App.5th 972 (*Wong*), Ceja argues the trial court erred in expressing his sentence in this way on counts 1, 2, and 3 due to its reference to a minimum term of imprisonment instead of his minimum parole eligibility.

We are not persuaded by the statements in *Wong, supra,* 27 Cal.App.5th 972, that this "shorthand pronouncement is incorrect because it indicates a minimum term exists, rather than a minimum parole eligibility." (*Id.* at p. 977, fn. 4.) While it might be more precise to describe the minimum term of confinement as the minimum parole eligibility period, it was not clearly error for the trial court to characterize it as a minimum term of imprisonment. In addition, we agree with *People v. Jefferson* (1999) 21 Cal.4th 86 (*Jefferson*), that describing the minimum parole eligibility period as a minimum prison term accurately communicates the import of Ceja's sentence in a straightforward way that may be more easily understood by those who are not criminal law specialists. (See *Jefferson, supra*, 21 Cal.4th at p. 101, fn. 3.)

### D. Abstract of judgment must be corrected regarding proper firearm enhancement

As to counts 2 and 3, the jury found firearm enhancement allegations true pursuant to section 12022.53, subdivision (c). The court imposed section 12022.53, subdivision (c) enhancements when it sentenced Serrano and Ceja. Nevertheless, both Serrano's and Ceja's abstracts of judgment incorrectly list "PC 12022[.]53(d)" on counts 2 and 3 and they both seek correction of their abstracts. The Attorney General concedes the errors, and we agree the concession is well-taken.

Discrepancies between an abstract of judgment and the actual judgment as orally pronounced are subject to correction at any time and should be corrected by a reviewing court when detected on appeal. (*People v. Mitchell* (2001) 26 Cal.4th 181, 188.) Accordingly, on remand, the trial court should ensure that the new abstract of judgment accurately reflects the correct statutory provision, i.e., section 12022.53, subdivision (c), for the firearm enhancements associated with counts 2 and 3.

54

*E. Assembly Bill Nos. 333 and 518*

In supplemental briefing, Serrano and Ceja argue they are entitled to the retroactive application of amendments to sections 186.22 and 654 which became effective on January 1, 2022. Assembly Bill No. 333 (2021-2022 Reg. Sess.) amended section 186.22, by, among other things, modifying the definitions of "pattern of criminal activity" and "criminal street gang," as well as clarifying what is required to establish that an offense "benefit[s], promote[s], further[s], or assist[s]" a criminal street gang. (Stats. 2021, ch. 699, § 3.) Assembly Bill No. 518 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 441, § 1) amended section 654 by eliminating the requirement that a defendant shall be punished under the provision providing for the longest term of imprisonment and granting the trial court discretion to impose punishment under any of the applicable provisions.

Serrano and Ceja also argue that they are entitled to the retroactive application of Assembly Bill No. 333's enactment of section 1109, which empowers defendants to request a bifurcated trial on gang enhancements.

The Attorney General agrees that both defendants are entitled to reversal of the guilty verdicts on the substantive gang offense (§ 186.22, subd. (a); count 8), as well as the true findings on the gang enhancements (§ 186.22, subd. (b)) charged in connection with counts 1 through 7. The Attorney General further agrees that both defendants are entitled to resentencing on counts 1 through 7 for the trial court to exercise its discretion under section 654, as amended. However, the Attorney General does not agree that section 1109 is retroactive but, even if it were, the Attorney General argues that the defendants were not prejudiced by the failure to bifurcate the gang enhancements.

*1. Amendments to section 186.22 and effect on substantive gang offense and gang enhancements*

As explained in *People v. Perez* (2022) 78 Cal.App.5th 192 (*Perez*), "Assembly Bill No. 333 . . . amended section 186.22 by modifying the definitions of 'pattern of

55

criminal activity' and 'criminal street gang,' and it clarified what is required to show an offense 'benefit[s], promote[s], further[s], or assist[s]' a criminal street gang." (*Id*. at p. 206.) Section 186.22 now " 'requires proof of the following additional requirements with respect to predicate offenses: (1) the offenses must have "commonly benefited a criminal street gang" where the "common benefit . . . is more than reputational"; (2) the last predicate offense must have occurred within three years of the date of the currently charged offense; (3) the predicate offenses must be committed on separate occasions or by two or more gang members, as opposed to persons; and (4) the charged offense cannot be used as a predicate offense.' " (*Perez*, *supra*, at p. 206.) "With respect to common benefit, the new legislation explains: '[T]o benefit, promote, further, or assist means to provide a common benefit to members of a gang where the common benefit is more than reputational. Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant.' " (*People v*. *Lopez* (2021) 73 Cal.App.5th 327, 345 (*Lopez*).)

We agree with the parties regarding the retroactive application of amended section 186.22. The amendments to section 186.22 by Assembly Bill No. 333 increased the threshold for conviction under the gang enhancement statute. " '[A] defendant is entitled to the benefit of an amendment to an enhancement statute, adding a new element to the enhancement, where the statutory change becomes effective while the case was on appeal, and the Legislature did not preclude its effect to [a] pending case.' " (*Lopez*, *supra*, 73 Cal.App.5th at p. 344.) Accordingly, Serrano and Ceja are entitled to retroactive application of amended section 186.22.

The parties agree that the record lacks substantial evidence that the defendants "collectively" engaged in a "pattern of criminal activity" as required by amended section 186.22. We agree with the parties that the record is insufficient to support the heightened proof requirements of amended section 186.22.

Based on the foregoing, we will vacate Serrano's and Ceja's convictions on the substantive gang offense (count 8) and the true finding on the gang enhancement allegations on counts 1 through 7. We will remand the matter to allow the prosecution the opportunity to retry both the substantive gang offense and the gang enhancement allegations. (*Sek, supra,* 74 Cal.App.5th 657, 674.)

### 2. *The defendants were not prejudiced by failure to bifurcate the gang enhancements*

Effective January 1, 2022, Assembly Bill No. 333 (2021-2022 Reg. Sess.) added section 1109 (Stats. 2021, ch. 699, § 5) to the Penal Code. Section 1109, subdivision (a) provides that, upon request by the defense, a gang enhancement charged under subdivision (b) or (d) of section 186.22 shall be tried separately after determination of the defendant's guilt of the underlying charge. Section 1109, subdivision (b) provides that a violation of section 186.22, subdivision (a) shall be tried separately from all other charges that do not require gang evidence as an element of the offense.

In supplemental briefing, both defendants argue that the bifurcation requirement created by section 1109 applies retroactively to their convictions, which are not yet final. They further argue that the failure to bifurcate requires that we reverse the entire judgment entered against each of them so that the charges may be tried in a bifurcated proceeding in which the jury will first deliver a verdict on the underlying charges without being exposed to the evidence relating to the gang enhancements. The Attorney General disagrees on both points.[40]

As our Supreme Court has recently noted, case law is split on the question of whether section 1109 applies retroactively. (*People v. Tran* (2022) 13 Cal.5th 1169, 1208 (*Tran*).) In *Tran*, our Supreme Court declined to take a position on whether section

---

[40] The Attorney General also argues the issue is forfeited. We decline to address the question of forfeiture because we reach the merits and reject the underlying claim. (See *People v. Lua* (2017) 10 Cal.App.5th 1004, 1014.)

1109 applies retroactively to convictions that are not yet final, as any error in failing to bifurcate the trial of the gang enhancements was harmless in that case. (*Tran*, *supra*, at p. 1208.)[41] As we will explain, we take the same approach here. Assuming without deciding that section 1109 applies retroactively, the failure to bifurcate the trial of the gang enhancements was harmless error.

In their supplemental briefs, filed prior to our Supreme Court's issuance of *Tran*, the defendants argue that the failure to bifurcate the trial of the gang enhancements constituted structural error and is therefore reversible per se. That position was rejected in *Tran*. (*Tran, supra*, 13 Cal.5th at p. 1208 [rejecting the defendant's "contention that the failure to bifurcate constitutes structural error"].) Because the admission of prejudicial evidence typically constitutes trial court error, a reviewing court can evaluate the extent of the prejudice. (See, e.g., *People v. E.H.* (2022) 75 Cal.App.5th 467, 480 (*E.H.*) [applying *Watson* harmless error analysis].)

### 3. Evaluating the evidence here, the failure to bifurcate was harmless

First, Serrano and Ceja still would have been convicted of all their offenses since there was overwhelming evidence that implicated them in the shooting, including possession of the weapons used, the text messages planning the shooting, cell tower evidence establishing their proximity to the crime scene and their codefendant, Serrano's immediate search for and repeated views of news articles about the shooting, Ceja's flight path to his work just after the shooting; and surveillance video of Ceja's distinctive Denali SUV approaching the location of the shooting moments before it occurred. In such circumstances, "it is unlikely the defendant was harmed by the format of the trial." (*People v. E.H.*, *supra*, 75 Cal.App.5th at p. 480, citing *People v. Pinholster* (1992) 1 Cal.4th 865, 931, overruled on other grounds in *People v. Williams* (2010) 49 Cal.4th

---

[41] The question of whether section 1109 applies retroactively is currently under review by the California Supreme Court in *People v. Burgos*, *supra,* 77 Cal.App.5th 550, review granted July 13, 2022, S274743.

405, 459 [failure to bifurcate was harmless because of overwhelming evidence of defendant's guilt on relevant charges].)

Second, section 1109 does not necessarily preclude gang-related evidence in a bifurcated trial if the evidence relates to the underlying charges. (*People v. Ramos* (2022) 77 Cal.App.5th 1116, 1132.) Here, as in *Ramos*, much of the gang evidence relating to Serrano would have been introduced at trial on the underlying offenses because it was relevant to Serrano's actions prior to the shootings, and his motive for his actions that night, i.e., hunting rival gang members. (*Ibid*.; see also *People v. Hernandez, supra,* 33 Cal.4th at pp. 1049-1050 ["To the extent the evidence supporting the gang enhancement would be admissible at a trial of guilt, any inference of prejudice would be dispelled, and bifurcation would not be necessary."].) For example, Serrano's text messages showed that he intended to elevate promote an "up and comer," i.e., Arellano, in the gang hierarchy. The gang expert testified that aspiring members of LPT had to commit a shooting to become full members. The rap video was, in the trial court's view, highly probative of Serrano's intent to shoot at rival gang members, and that it had little potential for prejudice. The evidence of Serrano's gang affiliation, such as the photos of him wearing gang clothing, using gang signs, and even holding a gun, was therefore relevant to establish both his motive and intent that evening.

Applying the *Watson* standard, we conclude that it is not reasonably probable that the outcome of the trial on the underlying charges would have been different in the absence of the gang evidence that would not have been otherwise admissible. Even assuming section 1109 is retroactively applicable in this case, the failure to bifurcate the trial of the gang enhancements was not prejudicial error and thus there is no basis for reversing Serrano's or Ceja's other convictions.

### 4. *Amendment to section 654*

Finally, Serrano and Ceja contend that the matter must be remanded for resentencing on counts 1 through 7 so that the trial court may exercise its discretion under

59

recently amended section 654. The Attorney General concedes that remand is appropriate and we agree that the concession is well-taken.

Section 654 prohibits multiple punishment for a single act or omission. (See *People v. Delgado* (2017) 2 Cal.5th 544, 570.) At the time of defendants' sentencing, section 654 required the trial court to punish a defendant "under the provision that provide[d] for the longest potential term of imprisonment." (§ 654, former subd. (a).)

Effective January 1, 2022, section 654 was amended by Assembly Bill No. 518 to give the trial court discretion to select the provision under which a defendant would be punished. As relevant here, section 654 now provides, "An act or omission that is punishable in different ways by different provisions of law *may be punished under either of such provisions*, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a), italics added.)

The amendment of section 654 effected an ameliorative change to the law as trial courts are no longer required to impose sentence under the provision that provides for the longest term of imprisonment when a defendant is convicted of multiple crimes for a single act or omission. We agree with the parties that Serrano and Ceja are entitled to the retroactive application of amended section 654 because there is no indication that the Legislature intended the law to apply prospectively only, and this case is not yet final. (See, e.g., *People v. Mani* (2022) 74 Cal.App.5th 343, 379-380; *People v. Sek*, *supra*, 74 Cal.App.5th at pp. 673-674; *People v. Mendoza* (2022) 74 Cal.App.5th 843, 861-862.)

We will therefore remand the matter for resentencing under amended section 654.

### III. DISPOSITION

The judgments are reversed. The trial court is directed to vacate the true findings on the gang enhancements (Pen. Code, § 186.22, subd. (b)) charged in connection with counts 1 through 7 and the verdicts on the substantive gang offense (Pen. Code, § 186.22, subd. (a); count 8). The remaining convictions for both Serrano and Ceja are otherwise affirmed.

60

The matter is remanded to the trial court for a possible retrial of the gang enhancement allegations and substantive gang offense. If the prosecutor elects not to proceed with a retrial, or at the conclusion of the retrial, the trial court shall resentence defendants pursuant to current law.

_____
                Wilson, J.


WE CONCUR:




_____
       Bamattre-Manoukian, Acting P.J.




_____
       Danner, J.




*People v. Serrano*
H047310
*People v. Valenzuela*
H047329